IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| VS.      NO. 4:78-CV-25 SMR | |
| STATE OF ARKANSAS, et al. | DEFENDANTS |

CONSOLIDATED WITH

| | |
|---|---|
| FRANK E. TAPPIN, et al. | PLAINTIFFS |
| VS.      NO. 4:91-CV-627- SMR | |
| ARKANSAS STATE POLICE DEPARTMENT, et al. | DEFENDANTS |

**PLAINTIFFS' AMENDED MOTION FOR ENFORCEMENT OF TAPPIN SETTLEMENT AGREEMENT, STATUS REPORT AND REPLY TO DEFENDANTS' RENEWED MOTION TO TERMINATE THE COURT'S SUPERVISION OF THE TAPPIN SETTLEMENT AGREEMENT**

COMES NOW the Plaintiffs, Frank E. Tappin et al, by and through their attorneys, Duncan Firm, P.A., and for their Amended Motion and Reply and state as follows:

### Introduction

1. According to this Court's Order September 22, 2004, this Court specifically retained jurisdiction of the Tappin Settlement Agreement. The Order did not address whether the Tappin Plaintiffs had any standing in the Consent Decree. *Attached as Exhibit 1.*

2. By separate Order dated September 21, 2004, this Court retained jurisdiction of the Consent Decree "for such relief or other orders as may be appropriate, including enforcement of the Court's orders and resolution of disputes that may arise among the parties." The Order went on to state that "the 1978 Consent Decree shall both [meaning the order and Consent

Decree] expire unless a party moves the Court upon forty- five (45) days notice to the other party to extend any of the provisions of the Consent Decree or this Order." *Attached as Exhibit 2.*

3. Plaintiffs filed a Motion requesting this Court to resolve a dispute and to continue to monitor the Arkansas State Police (ASP) for hiring, selection and promotions. Plaintiffs filed this Motion on August 4, 2006, giving more than forty-five (45) days notice to the other party because of the possibility that both the September 21 and September 22 Orders should be read together.

4. If the two Orders are read together, then a party provides notice by "moving the Court upon forty-five days notice" prior to September 21, 2006. Out of an abundance of caution, Plaintiffs filed their Motion giving forty five days notice to Defendant of disputes.

5. Previous to filing the Motion, Plaintiffs had sent correspondence to the Defendant identifying specific areas of dispute involving adverse impact and breach of the Tappin Settlement Agreement. *(See attached exhibits).*

6. Plaintiffs had been conferring over a period of months with Defendants about needed discovery to conduct analysis to determine if there was a dispute. Additionally, Plaintiffs were experiencing disparate treatment and all of this was discussed in correspondence with Defendants. *(See attached exhibits).*

7. Since Plaintiffs have a dispute with the Defendants, pursuant to this Court's orders, they are reporting to the Court their disputes to be resolved.

8. The original August 4, 2006 Motion filed by Plaintiffs should probably have been entitled **Status Report: Notice To Other Party of Disputes**. However, since the parties had been corresponding on the issue and Plaintiffs concerns had been voiced in said correspondence, Plaintiffs simply moved the Court for an extension of the Settlement Agreement. As the

Defendants are well aware, this case has been going on for over fifteen (15) years and has been continually monitored by the Court during that time.

9. Since the Tappin Order did not contain any automatic expiration language, Plaintiff class members feel that the forty-five (45) day notice was an attempt to cooperate with the Defendants and comply with the spirit of the Court's directives. As such, Plaintiffs feel that Defendants argument about Local Rule 6.2(b) is misplaced because Plaintiffs were in communication with the Defendants and in compliance with this Court's Orders.

10. By raising Local Rule 6.2(b), Plaintiffs feel that Defendants have now seized on the title of Plaintiffs' Motion and incorrectly attacked it, requiring a statement of conferment among the parties when the parties have, in fact, been conferring through correspondence all along. Additionally, Plaintiffs have complied with the spirit of the Court's Order by providing notice to the Defendants and their attempt to get this Court to ignore what Plaintiffs feel to be are clear violations of the Settlement Agreement is contrary to the history of this case.

11. The Court's Order and previous directives supercede the local rule cited by Defendants. Additionally, this Motion is in the nature of a status report in which Plaintiffs are alerting the Court to violations of the Settlement Agreement.

12. As the Defendants are aware based on correspondence, Plaintiffs have recently identified adverse impact regarding African-American troopers and the written trooper exam.

13. Plaintiffs are informing the Court of a legitimate dispute and the need for the Court to resolve a difference among the parties, as mentioned in the Order cited above. Plaintiffs have concrete proof of adverse impact from both the Court-ordered monitor and an independently retained expert. *See Report of Katherine Jackson, attached as Exhibit 3, and Report of Jay Marsh, attached as Exhibit 4.*

14. Dr. Veres' office, represented by Katherine Jackson, found a clear violation of the 4/5 rule. Likewise, Jay Marsh found violations of the 4/5 rule and, from a statistical standpoint, concluded that there was a 99.5 percent chance that race was a determining factor in hiring of troopers.

15. Plaintiffs submit that it should be considered improper for the Defendant to be attempting to side-step the Court-ordered monitoring process that has been ongoing for fifteen (15) years.

16. Because Defendants raised objections to Plaintiffs communicating with the Court-appointed monitor, Plaintiffs have retained their own expert, Jay Marsh. However, this Court should take note of the fact that the Defendants have <u>not</u> been cooperating with the Plaintiffs and have <u>not,</u> until recently and only after insisting on a protective order, sent the Plaintiffs documents that Plaintiffs needed

17. It should be noted that in this history of this case, there has never been a protective order and Plaintiffs feel that the defendants' insistence on one now at this critical stage delayed this status report and that Defendants' conduct in relation to the Settlement Agreement is the issue that required the forty-five (45) days notice.

18. Plaintiffs point out through the attached correspondence that Defendants have been on notice for some time that Plaintiffs believed the terms of the Settlement Agreement were not being met. Defendants should not be allowed to pretend that they were not aware that this action was forthcoming and should recognize that conferment has taken place between the parties.

19. Plaintiffs feel at this point it would be appropriate to provide background and status to the Court in the form of a time line.

## Historical Time Line

20.     At the time this matter started, approximately a year before the Complaint was filed, there were only two (2) African-American sergeants and one (1) African-American officer with a higher rank, who was retiring to the US Marshall's office. After Plaintiffs allege a race-based selection system, the Arkansas State Police promoted two (2) additional African-Americans to improve compliance, making a total of four (4) African-American officers with any rank in the entire state. It should be noted that these four were all sergeants.

21.     On September 27, 1991, African-American commissioned employees of the ASP filed a class action complaint alleging unlawful employment discrimination. Among the relief sought was enforcement of the 1978 Consent Decree between the United States and the State of Arkansas which was to "ensure that blacks and women are not disadvantaged by the hiring, promotion, assignment and other employment policies and practices of the ASPD."

22.     Plaintiffs' counsel spent eight (8) years litigating a similar discrimination matter concerning the city of Little Rock police department and its promotion system and successfully obtained relief for African-American officers after two trials and two appeals. *See Gilbert et al. v. City of Little Rock*, 544 F.Supp 1231 (1982, 8th Cir.), 722 F.2d 1390 (1983, 8th Cir.), 493 U.S. 812 (*Cert. Denied,* 1984). The Little Rock Police Department had, at the time of the suit, approximately three hundred (300) officers with fourteen (14) African-American officers and one (1) African-American sergeant. The Arkansas State Police had, at the time of the suit, approximately three-hundred fifty (350) officers, forty-eight (48) African-American troopers and

two (2) with rank. As can be seen, both systems had obvious problems. As a result of trial experience in a case involving poor statistics and low numbers of African-Americans with rank (Little Rock Police case), the State of Arkansas approached Plaintiffs' counsel about settlement.

23. Subsequently, there were settlement hearings in which Captain Eddy and Colonel Bailey both testified to the known discriminatory practices of the Arkansas State Police; Consequently, a Settlement Agreement was approved. Judge Reasoner entered orders resulting in a new promotion system to be validated, along with providing eight (8) sergeant positions and one (1) lieutenant position for African-American officers. This brought the total African-American's with rank to eleven sergeants and one lieutenant.

24. The Federal District Court approved the Settlement Agreement on September 28, 1995, that set out the terms that the ASP must comply with in order to resolve this matter.

25. As part of the Settlement Agreement, Plaintiffs and Defendants entered a Joint Stipulation of Facts. *Attached as Exhibit 5.* Among the stipulated facts were that in an 11 year period (1978-1989), there were 62 promotions to sergeant made, of which two (2) were African-American; in the same time span, 141 promotions were made to sergeant, lieutenant and captain ranks combined, again only two (2) were African-American; because of the past problems of promotion and hiring, a black recruiter will best enable the ASP to acquire the best available black candidates for hiring, and; it is a business necessity that the recruiter be a black officer with rank.

26. Plaintiffs notified Defendants by letter dated January 7, 1999, that there were facts suggesting the terms of the Settlement Agreement had not been fulfilled. *Attached as Exhibit 6.* Among the facts cited by Plaintiffs were: first hand accounts of named plaintiffs being singled out for disparate treatment and/or not receiving proper consideration for assignments; delay of

more than two (2) years in implementing the hiring and promotion system articulated by the Settlement Agreement; failure to implement human relations training courses as articulated by the Settlement Agreement, and; failing to give the minority recruiter the staff and materials necessary to perform his or her duties.

27. By letter dated May 4, 1999, Plaintiffs informed Defendants that they were on notice of breach of the terms of the Settlement Agreement for failure to successfully implement the hiring and promotion system dictated by the Settlement Agreement. *Attached as Exhibit 7.*

28. Defendants responded to that letter on May 7, 1999, by claiming that no breach had occurred, despite the admitted failure to properly implement the hiring and promotion system. *Attached as Exhibit 8, along with Plaintiffs' response.*

29. By letter dated July 9, 1999, Plaintiffs again pointed out that the provisions concerning successful implementation of human relations courses and an adequately equipped minority recruitment officer were still not satisfied per the Settlement Agreement. *Attached as Exhibit 9.* Additionally, since those areas serve as a foundation for the promotion system, Plaintiffs asserted that the successful implementation of the promotion system was being delayed due to breach in these other areas.

30. Following a meeting between Plaintiffs and Defendants on September 2, 1999, Plaintiffs asked Defendants to memorialize the discussion in a letter indicating the specific steps Defendants were planning to take to rectify breach of the agreement. *Attached as Exhibit 10.* This was not done by Defendants.

31. On December 18, 1999, Captain Dwight Tosh of the ASP formally acknowledged inappropriately encouraging promotion of an officer in violation of the Tappin Settlement Agreement. *See Tosh letter, attached as Exhibit 11.*

32.     On April 3, 2000, Plaintiffs sent a letter to Defendants following a meeting to discuss steps by Defendants to remedy the breach. *Attached as Exhibit 12*. Plaintiffs advised Defendants that "we are pleased, of course, that you have assured us that the [ASP] has now implemented cultural diversity/sexual harassment training at all levels and has begun to address the minority recruiting needs on a deeper level. However, as we explained to you...we still have no basis for evaluating the ASP's compliance with these requirements of the Settlement Agreement." The letter concluded by asking for a joint review of the progress of Defendants and a report to the Court.

33.     Plaintiffs wrote on June 8, 2000, asking that Dr. Veres again become involved in the outstanding matters to be resolved. *Attached as Exhibit 13*. Dr. Veres corresponded to all parties on June 13, 2000, and indicated that he had a "continuing interest in examining the applicant flow data requested by the parties."

34.     By letter dated June 23, 2000, the Justice Department noted a "a lack of communication from the Defendants to the parties since mid-1999. *Attached as Exhibit 14*. Until very recently, neither the other parties no Dr. Veres had data on the State Police's recent hiring and promotion practices." The letter went on to enumerate ten (10) areas which the Justice Department was concerned with and how Defendants might address the concerns.

35.     February 20, 2001, Plaintiffs provided, by a series of letters, descriptions of the remaining areas of concern with the satisfaction of the Settlement Agreement. *Attached as Exhibit 15*. This letters were generated, in part, due to the resignation of Colonel Mars, director of the ASP. Plaintiffs again proposed a joint document to be put before the Court detailing concerns with the Settlement Agreement provisions considered to be in breach.

36. Plaintiffs filed a Court-ordered status report on November 19, 2001, following a hearing in February of that year, pointing out that "the Court–Appointed Monitor reported to the parties that the promotion process used by the [ASP] over the past three years had produced a statistically significant adverse impact on African-American Troopers." *Attached as Exhibit 16.* The status report went on to say :

> "[d]ue to the continued existence of the effects of past discrimination and the adverse impact on African-Americans, the fact that there has been manipulation, and the lack of a full remedy by the [ASP], it will be necessary for the Court to review the facts and rule on the matter of what remedy is required to comply with the Law, the Settlement Agreement and the Consent Decree."

37. On August 25, 2003, the Plaintiffs again moved for a status hearing and asked the Court for active supervision of both the Consent Decree and Settlement Agreement.

38. By Joint Motion dated December 11, 2003, both the United States and the State of Arkansas moved the Court to deny Plaintiffs request for active supervision, in part, because "the Tappin plaintiffs lack standing to seek enforcement of the Consent Decree." *Attached as Exhibit 17.*

39. On June 16, 2004, Plaintiffs again filed a Status Report and Motion for an Expedited Hearing. *Attached as Exhibit 18.* At issue was whether or not the ASP could be "in compliance" with the Settlement Agreement by belatedly promoting three African-American officers in an effort to manipulate the numbers and claim compliance.

40. The hearing occurred on August 12, 2004. The Order arising from that hearing indicated that the Court retained jurisdiction over the Settlement Agreement and "encourages the parties to work together toward resolving any outstanding issues and setting a date for its

termination." By the same Order, the Court also denied the State's Motion to Terminate the Court's Supervision the Settlement Agreement. *Order attached as Exhibit 19.*

41.  By Order issued September 21, 2004, the Court granted the Joint Motion to Modify the Consent Decree, filed on behalf of the United States and the State of Arkansas. Among the provisions for that modification were that the defendants were ordered to "remove barriers to assignment and promotion based on race or sex", defendants "shall implement the Strategic Recruitment Plan for trooper positions that was designated in July, 2002, within twelve (12) months of this Order. Unless specifically dissolved or amended by this Order, all provisions of the Consent Decree shall remain in full force and effect until further order of this Court. Additionally, the Order retained jurisdiction of the Consent Decree and set a two year expiration period from the date of the Order (to expire in September, 2006) for the *Consent Decree.* Either party (the United States or State of Arkansas) could move the Court upon 45 days notice to the other party to extend any of the provisions of the Consent Decree. The final provision stated that "[p]rior to the expiration of the Consent Decree, any party may move, for good cause shown, for an extension of this Order and the Consent Decree. In that event, this Order and the Consent Decree shall remain in effect until the Court rules on this Motion." This Order applied only to the Consent Decree.

## Status Report Concerning Disputes

42.  By Order dated September 22, 2004, the Court indicated it was pleased with the thorough report provided by the Tappin Plaintiffs regarding their efforts to determine what, if any, objections they had to the Joint Modification of the Consent Decree. Plaintiffs agreed not to object to modifications in the Consent Decree and the Court did not address the issue of standing because the "point is now moot." The Order concluded with the Court retaining jurisdiction over

the matter and "further issues involving the Settlement Agreement, including changes to the policy regarding promotion procedure, will be controlled by that Agreement." This Order is the most recent pertaining exclusively to the Settlement Agreement.

43.   Plaintiffs respectfully suggest that the September 22, 2004 Order by this Court is controlling in this matter; as was indicated in the original Motion for Extension of the Settlement Agreement, Plaintiffs were merely making a good faith effort to comply with the spirit of the Court's previous directives. Because the September 21, 2004 Order specified a notice period in the matter of the United States versus the Arkansas State Police, Plaintiffs incorporated that into our Motion, despite the fact that the Order in question concerned only the Consent Decree. According to the most recent Order controlling the Settlement Agreement, there is no express expiration date for the Settlement Agreement.

44.   Likewise, the local rule cited in Defendant's Response to our Motion is not applicable in this instance: Rule 6.2(b) appears to involve requests for extension of time or continuance in *procedural* matters, i.e., hearings and trials. Plaintiffs are asking that the current Settlement Agreement simply not expire at this time, as there are significant questions as to whether or not its objectives have been met. This is not a true motion for continuance or extension of time; rather, Plaintiffs' Motion asked this Court to make a ruling on the substantive matter of whether or not it was proper for the Settlement Agreement to expire on September 22, 2004, along with the Consent Decree. Again, this was done to comply with the spirit of the Court's previous directives, not because the Settlement Agreement was set to expire on the same date as the Consent Decree.

45.   Defendants claim in Paragraph 1 of the Introduction to their Response that "[f]or two years, Plaintiffs have not responded to the Defendants' repeated requests to meet or discuss a

resolution to this matter as ordered by the Court on September 22, 2004." In fact, the attached correspondence shows that Plaintiffs have consistently communicated concerns with the Defendants about the implementation of the terms of the Settlement Agreement. *2005 Plaintiffs correspondence is attached as Exhibit 20.* As an aside, Defendants have made no suggestions on how to remedy the concerns that Plaintiffs have pointed out to them; instead, they have consistently failed to timely provide requested information and then have complained that Plaintiffs have not solved the problem for them. The nature of the Settlement Agreement clearly put the onus on the Defendants to comply with the terms of the Settlement Agreement.

46. Defendants also claim in that same paragraph that they were "led to believe [the terms of the Settlement Agreement] were satisfied in 1999 with the express approval of the Plaintiffs and the court-appointed monitor, Dr. John Veres" Defendants cannot reasonably contend that they thought the objectives of the Settlement Agreement were met with the selection of a hiring and promotion system; clearly, the successful implementation of that system was required in order to fix the problem of discrimination within the ASP. As Plaintiffs have claimed since 2001, the objectives of the Settlement Agreement have not been met.

47. In paragraph 2 of the Introduction to Defendants' Response, Defendants assert that "Plaintiffs cannot pretend they were not aware of this fact because they were copied on this correspondence," referring to the most recent statistical data being supplied to Dr. Veres and the Department of Justice in a February 16, 2006 letter. *Attached as Exhibit 21.* However, as pointed out in that letter, Plaintiffs received the letter without the statistical enclosures.

48. As Defendants point out in their Response, the selection of the hiring and promotion system on May 6, 1999, did not end the work to be done in order for Defendants to comply with the Settlement Agreement. Indeed, the Settlement Agreement originally

contemplated a two-year implementation time period which this Court has extended on more than one occasion because the terms of the Settlement Agreement were not being fulfilled. Defendants point to two (2) revisions to the hiring and promotion policy in 2002 and 2005. How can Defendants claim the Settlement Agreement objectives were met with the selection of the hiring and promotion system in 1999 when they actively participated in the revisions in 2002 and 2005? Clearly, the Settlement Agreement must continue to control this matter until the actual objectives have been accomplished, including any revisions necessary to comply with the overall terms and spirit of the Agreement.

49. Defendants point out in numbered-paragraph 12 that this Court, in the August 2004 hearing, instructed the parties to "work together toward resolving any outstanding issues and setting a date for [the Settlement Agreement's] termination." Defendants' repeated use of this quote throughout its Response implies that Plaintiffs have been unwilling to work with Defendants to resolve outstanding issues. This is simply not accurate. Plaintiffs have been continually analyzing information, as received by Defendants, to determine if the Settlement Agreement objectives have been met. When Plaintiffs discover an area of concern, Defendants are immediately alerted to it, as illustrated in the attached correspondence. If Defendants are implying that the only way to "work together toward resolving outstanding issues" is for Plaintiffs' counsel to simply sign off and let the Settlement Agreement expire, then Defendant does not have a clear picture of Plaintiffs' counsel's role in this matter.

50. Paragraph 13 of Defendant's Response indicates Plaintiffs have "never responded to any of Defendant's invitations to meet or discuss outstanding issues or the expiration of the Settlement Agreement." In fact, Plaintiffs have taken an active role in discussing the Settlement Agreement and whether its terms have been complied with, as illustrated through the attached

correspondence. There have also been numerous phone calls among the parties on the outstanding issues. To say that Plaintiffs have refused to discuss a resolution to this matter is simply contrary to everything Plaintiffs have been attempting to do in the past two years.

51. Paragraph 16 of Defendant's Response indicates that information (the 2004-2005 applicant testing data) was provided to the Department of Justice, at their request, and copied to all parties. Then, in the following paragraph, Defendant points out that Plaintiffs requested this same information in November of 2005 and failed to respond to an October 16, 2005 request to point out deficiencies in the information. As illustrated in the attached exhibit, the original letter was again sent to the Plaintiffs *without the statistical enclosures.* Thus, Plaintiffs didn't have the complete information to respond to the October 16, 2005 request of Defendants. Plaintiffs did subsequently request that information and advised Defendants of their findings following analysis of the information.

52. Defendants also claim, in paragraph 20 of its Response to our Motion, that Plaintiffs' counsel was provided with the names and contact addresses of the class members in a mailing dated November 8, 2005. While a list of class members was provided in that mailing, no contact addresses were supplied. That information was provided by the State following entry of the Protective Order on May 19, 2006.

53. As the attached correspondence indicates from the time frame dealing with the Protective Order, Plaintiffs questioned the use of the Protective Order in the providing of information similar to that previously provided without entry of a Protective Order.

54. On January 19, 2006, the Justice Department notified Defendants of concerns with the hiring and promotional efforts, as exemplified by the polygraph and written examination. *Attached as Exhibit 22.* This letter was not materially different from the letter sent

by Plaintiffs on November 23, 2005. The Defendants do not challenge the accuracy of Plaintiffs conclusions, but instead complain that Plaintiffs "offered no solutions." Plaintiffs would defer to the expertise of the Court-appointed monitor and the Defendants themselves to develop and implement strategies to assure compliance with the terms of the Settlement Agreement.

55. Defendants point out in paragraph 27 that it provided information to both the Justice Department and Dr. Veres' office concerning "test score data pertaining to each individual for each test administration during the years 2003-2005, identified by race and sex, including both raw scores and T-scores for each test component and test score overall, together with an analysis of the pass/fail rates for women and African Americans overall and by test component." Defendants point out that Plaintiffs were copied on this correspondence, but again fail to point out that Plaintiffs were copied *without the statistical enclosures* (which were, in fact, the subject of the Protective Order that had not previously been required by Defendants).

56. Defendants acknowledge in its Response to our Motion that all the statistical information requested by Plaintiffs for over seven months (and provided to the Justice Department within that time frame) were finally provided to Plaintiffs on May 26 and May 30, 2006.

57. Plaintiffs analyzed the produced information and determined that there is a 4/5 rule violation in how the written examination impacts African-Americans. *See attached 2005 correspondence.* This information showed evidence of adverse impact in violation of the terms of the Settlement Agreement.

58. Out of frustration, Plaintiffs contacted the office of the Court-appointed monitor, Dr. Veres, and inquired whether that office had reached the same conclusions as Plaintiffs had. The sole correspondence between that office and Plaintiffs is attached. *Attached as Exhibit 23.*

59. Plaintiffs filed their Motion to Extend the Tappin Settlement Agreement (which was really a request that the Court not allow the Settlement Agreement to expire as satisfied, as addressed above) on August 4, 2006.

60. On August 7, 2006, Dr. Veres' office provided a report to the parties that concluded the written examination does indeed constitute adverse impact against African Americans based on the 4/5th or 80 percent rule. The report identified adverse impact in three (3) of the four (4) test subsections, as well as the overall examination. The report went on to identify whether or not African-Americans were subject to disparate treatment at each of the individual examination sessions; the report concluded that African-Americans were adversely impacted seven (7) out of thirteen (13) of the individual sessions. Thus, based on the Court-appointed monitor's report, African-Americans were subject to discrimination in the hiring process.

61. Plaintiffs have attached the report and CV of Robert Marsh, of Marsh Economic Consulting, showing a statistical analysis of the data on the written examination. As the attachment indicates, there is a less than a 0.5% probability that the results on three (3) of the four (4) individual testing components, as well as the overall written exam, could have occurred by chance. There is greater than a 99.5 percent chance that race is a determining factor in whether or not a candidate passes the exam and is ultimately hired. There is clearly race-based adverse impact in the hiring phase of the Arkansas State Police.

62. So long as the recruitment and hiring issues continue to persist, the terms of the Settlement Agreement cannot be considered fulfilled. Additionally, the promotion system is ultimately effected by deficiencies in the recruitment and hiring areas.

63. Additionally, Plaintiffs are in the process of compiling incident reports from class

members that detail discrimination within the ASP. These reports will be supplemented to the Court at the time they are available.

Based on all of the above reasons, Plaintiffs ask this Court to continue to retain jurisdiction over the Tappin Settlement Agreement, continue to enforce the Tappin Settlement Agreement, and assist the parties in resolving disputes in this matter.

                        Respectfully submitted,

                        Frank Tappin et al.
                        PLAINTIFFS

By: _____
PHILLIP J. DUNCAN, ABA #74039
Duncan Firm, P.A.
6315 Ranch Drive
P.O. Box 17850
Little Rock, Arkansas 72223

**CERTIFICATE OF SERVICE**

      I, Phillip J. Duncan, do hereby certify a copy of the foregoing has been electronically filed and electronically served upon the following on the 25th day of August, 2006:

Matthew B. McCoy
Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201-2610

Barbara Thawley
US Department of Justice
Civil Rights Division
Employment Litigation Section - PHB
950 Pennsylvania Avenue, N.W.
Washington, D.C 20530

                                                      _____
                                                      Phillip J. Duncan