IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 2 0 2004

JAMES W. McCORMACK, CLERK
By:_____
                    DEP. CLERK

UNITED STATES OF AMERICA                                    PLAINTIFF

vs.                          No. 4:78CV00025  SMR

STATE OF ARKANSAS, et al.                                   DEFENDANTS

**********

FRANK E. TAPPIN, et al.                                     PLAINTIFFS

vs.                          No.  4:91CV00627 SMR

ARKANSAS STATE POLICE DEPARTMENT, et al.                    DEFENDANT

### ORDER

The Court conducted a hearing on Thursday, August 12, 2004, in which to determine the issue of standing with regard to the *Tappin* Plaintiffs and to resolve pending motions.  After reviewing the pleadings filed and hearing oral arguments, the Court issued the following rulings:

The Court held its ruling with regard the Joint Motion to Modify the Consent Decree (Docket # 46) in abeyance for thirty (30) days from the date of the hearing.  The Court directed the parties to work together to determine with specificity what information is necessary for the *Tappin* Plaintiffs to ascertain if they object to the modification.  The Court did not issue a ruling with regard to whether the *Tappin* Plaintiffs have standing to object to any modification of the Consent Decree.  The Court will make that determination after the thirty-day period has expired.

EXHIBIT
19

The Court denied the State's Motion to Terminate the Court's Supervision of the *Tappin* Settlement Agreement (Docket # 151) without prejudice to renew.  Although the Court finds it has continuing jurisdiction over the *Tappin* Settlement Agreement, the Court encourages the parties to work together toward resolving any outstanding issues and setting a date for its termination.

The Motion by Class Plaintiffs for Status Hearing and for Active Court Supervision of Implementation of Consent Decree and Settlement Agreement (Docket # 147) was denied without prejudice to renew.

The Court granted the Federal Government's Motion for Leave to File a Supplemental Statement in Opposition to *Tappin* Plaintiffs Supplemental Reply to Response to Motion for Status Hearing (Docket # 154).

The Court denied the Motion by Class Plaintiffs to Vacate the Court's Order Granting Joint Motion for Entry of Agreement and Order and for Hearing (Docket # 160).

The Court granted the Motion to Withdraw Attorney Robert A.  Russell (Docket # 162). The Court additionally granted the oral motion to withdraw attorney John Walker from the record in this case.

The Motion by *Tappin* Plaintiffs for an Expedited Status Hearing (Docket # 169) is granted by virtue of the hearing the Court conducted on August 12, 2004.

IT IS SO ORDERED this 20th day of August, 2004.

_____
UNITED STATES DISTRICT JUDGE

THIS DOCUMENT **ENTERED ON** DOCKET SHEET **IN COMPLIANCE** WITH RULE 58 AND/OR 79(a) FRCP ON 8/23/04 BY _____

October 31, 2005

*By Facsimile and U.S. Mail*

Wendy L. Kelly
Senior Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201-2610

   RE: <u>Frank E. Tappin, et. al. vs. Arkansas State Police, et. al.</u>
      <u>Consolidated in USDC no. 4:91-CV-627</u>

Dear Ms. Kelly,

   We have not yet received the Arkansas State Police's compliance report for January 1, 2005 through June 30, 2005 in the above referenced case. Please forward a copy as soon as possible. Please note, also, that we will expect the compliance report for July 1, 2005, through December 31, 2005 as soon as it is available in order to meet the terms of the Settlement Agreement.

   By letter dated August 8, 2005, David J. Palmer, U.S. Department of Justice, Civil Rights Division, requested additional information to accompany the compliance report, including:

   1) The results of each selection component administered to trooper applicants, broken down by the total number applied, the number passed, and the number failed, identified by race and gender;

   2) The scores of each candidate, identified by name, race, and gender;

   3) The passing score for each component, if any;

   4) A description of how each component is used (i.e., in order to rank applicants, etc.);

   5) A copy of any eligible list, and the disposition of each candidate on the eligible list;

   6) The reason each trooper candidate who applied "failed to meet pre-offer-requirements" or was otherwise not hired as a trooper;

1


EXHIBIT
2D

7) With regard to the five rehired troopers, please describe the circumstances under which each was rehired.

Please provide the results of the above request(s)to us as soon as possible.

Plaintiffs will require the above information, as well as the additional information listed below to analyze the issue of the State's compliance with the terms of the settlement agreement entered into in November, 1994.

First, please provide a current list of the State's black police officers, including date of hire, date of promotion(s) and contact information, including current addresses.

Second, Plaintiffs request, when prepared, the expanded Recruiting Reporting Form alluded to in your August 25, 2005 Recruitment Plan Report. We are specifically interested in a time table for implementation of the enumerated initiatives, as well as the immediate results of the initiatives and all statistical data that underlies them. We also seek the long-range projections of each initiative and all statistical data that underlies them.

Third, please provide a current list of Human Relations courses on race and gender presented to all new recruits. Plaintiffs are interested in a range of dates for these course offerings so that a representative might attend and observe the proceedings. In addition, please provide documentation, where available, for all other sworn personnel who have taken one or more of these course offerings, to include the name of the officer, the course(s) attended, dates of the course(s), and any final completion or grading documents.

I have recently resumed leadership of this case and am in the process of reviewing material and gathering facts. I will communicate additional requests for information to you as they become available.

I am deeply concerned about the recent matter involving Cpl. Lynn T. Breckenridge. As you are aware, a federal jury found that race was a motivating factor in his 2001 demotion and the State has agreed not to appeal the verdict. The finding in that case is contrary to the purpose of our settlement agreement "to ensure that African American men and women are not disadvantaged by the selection, hiring, assignment and promotion policies and practices of the Arkansas State Police Department." As you no doubt know, I will not agree to any termination of the settlement agreement until I am satisfied that its purpose has been met.

2

Please provide all requested information via facsimile at (501) 868-2505 and/or to the above mailing address as soon as possible. Thank you for your continued cooperation in this matter.

Sincerely,

Philip J. Duncan

cc:     Honorable Susan Webber Wright
        Barbara Thawley, Esq.
        Dr. John Veres

3

# DUNCAN & RAINWATER PA
## DUNCAN | RAINWATER | HOLT | SEXTON

**FILE COPY**

PHILLIP J. DUNCAN
MICHAEL R. RAINWATER
J. STEPHEN HOLT
ROBERT M. SEXTON

JASON E. OWENS
MATTHEW C. HUTSELL
JANAN ARNOLD DAVIS
JEREMY M. MCNABB
JAMES H. BARTOLOMEI

November 14, 2005

*By Facsimile and U.S. Mail*

Wendy L. Kelly
Senior Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201-2610

> RE:   <u>Frank E. Tappin, et. al. vs. Arkansas State Police, et. al.</u>
> <u>Consolidated in USDC no. 4:91-CV-627</u>

Dear Ms. Kelly,

Thank you for your letter dated November 8, 2005, and for responding to Plaintiffs' request for information. In order to gain a better understanding of the status of recruiting, hiring and promoting of African-Americans, as well as the general environment for African-American employees, we request further information to determine the quality of integration within the Arkansas State Police department.

In our letter dated October 31, 2005, we requested a current list of the State's African-American police officers, including date of hire, date of promotion(s) and contact information, including current addresses. We received the list of officers, however, we did not receive the current addresses requested. Please forward current contact information on the officers provided as soon as possible, in both electronic format, if available, and hard-copy.

The information provided indicates that a commissioned employee is subject to mandatory promotion from the date of hire forward (i.e., promotion from Recruit to Trainee after six months service, promotion from Trainee to Arkansas State Trooper after one year service, promotion from Arkansas State Trooper to Trooper First Class after three years of service, and promotion from Trooper First Class to Corporal after an additional three years of service). Promotions from Corporal forward appear to be merit based. Please provide any instances by which any of the above cited mandatory promotions did not occur for African-Americans and a list of white officers who failed to receive the mandatory promotions and the specific reason for the lack of promotion. The relevant time frame at this point would be from the time we gave notice of a breach of the Settlement agreement, January 7, 1999; roughly the last six (6) calendar years. (Although, technically, the breech existed since September 28, 1995 as that letter stat



Letter to Wendy L. Kelly
11/14/200                                    2

     We also would like a better understanding of the merit system used to select candidates for promotion in ranks beyond those based on the mandatory system. Please provide us with the last sergeant and lieutenant exam materials, a list of officers who took these tests and a list of those who passed these tests, as well as a list of all promotions to Sergeant and Lieutenant since January 1999. Include in this list any demotions of African-Americans police officers as well as white police officers.

     The previous letter also requested a list of all current Human Relations courses on race and gender. We received a list of course participants, but not a complete list of courses. We need information on those courses, to included a synopsis and copies of any available department-issued teaching materials, to help us understand what is being taught. In addition, we ask for a list of upcoming dates for each of the enumerated courses and any material that will be provided to the participant before or during the course(s). Finally, we request information regarding the nature of completion of the enumerated courses, specifically if the attendees are required to participate in any kind of exam or exercise to complete the course or if attendance is the only requirement. Please provide us information on any follow-up training for supervisors to monitor the implementation of the materials. Additionally include in this material any positive reinforcement plans by ASPD and course material related to those plans.

     Provide also a list of any equal opportunity officers assigned to various state police organizations (e.g. Troop, Company, etc.). These officers would be those who receive equal opportunity complaints and seek resolution of any discrimination complaints at the department level. If this position exists, please provide any additional race and gender training these officers receive, to include a list of courses, a synopsis of those courses, and a copy of any training material used at those courses.

     Reviewing the recent statistical information provided by your office in the 2005 Compliance report, we noted that only 8 African-American male applicants (11 percent) were ultimately selected for hire, while 51 white male applicants (22 percent) were selected for hire. However, no African-American female applicants were selected for hire. By contrast, the total male applicant pool was roughly one-third African-American. (As an aside, the report indicates that eight (8) African-Americans were approved for eligibility by the Commission, but nine (9) African-Americans were listed under the "hired" section.)

Letter to Wendy L. Kelly
11/14/200                                3

| Race/ Gender | Initial Pool | Passed Written Exam | Passed PAT | Passed Polygraph |
|---|---|---|---|---|
| WM | 548 | 272 (50%) | 182 (67%)(33%) | 119 (65%)(21.7%) |
| BM | 210 | 53 (25%) | 31 (58%)(14%) | 10 (32%)(4.7%) |
| WF | 78 | 40 (51%) | 16 (40%)(20%) | 10 (63%)(12%) |
| BF | 70 | 4 (6%) | 2 (50%)(3%) | 1 (50%)(1.4%) |
| Source of Data: 2004 Summary Chart from AG's November 8, 2005 letter. Rightmost percentage is based off initial pool data | | | | |

We are concerned that these figures show that the written exam and the polygraph both produce an adverse impact on African-American applicants. We need an explanation for why the black males and the single black female did not make it to the eligibility list. The only areas remaining that we are aware of are the background and credit check. In reference to the credit check, we seek information about whether or not white candidates are given the opportunity to clean up their credit, counseled about their credit, and/or given the opportunity to explain the credit check. We say this because if you are recruiting African American candidates out of the colleges, they may have acquired credit problems during college that would be remedied by employment and time. Was any effort made to determine whether African-Americans are more prone to acquire debt in college than white Americans? Was any consideration given to an interview process where the applicants were given a chance to explain their debt and the opportunity to attend a credit management course?

As we pointed out in our January 7, 1999 letter giving notice of breech, we indicated that some officers were reporting disparate treatment, and that the recruiter was not provided with adequate staff to complete the task. One of the weaknesses in the Arkansas State Police's promotion/selection/hiring system was its inability to recruit African-American applicants who completed the process.

This being the case, please provide a complete list history of the recruitment process since settlement (1994). We know that Frank Tappin was initially placed in the recruitment position and stayed there until Carl Kirkland replaced him. We believe the next recruiter was Gary Adams, and then Alex Finger. If there were any other recruiters during the relevant time frame, please provide their names and contact information. We are not sure what type of support provided by management was and the amount of support staff available to the recruiter. We need specific details, as this is one of the problem areas that the class identified as a breach in 1999.

Letter to Wendy L. Kelly
11/14/200                                    4

   We are also interested in how the written examination for entry level is developed and administered. Please provide us with a copy of exams administered over the past six calendar years. In addition, please explain the method used to evaluate what questions are used on these tests. Please also explain what type of testing (e.g. true/false, multiple choice, close, etc.) and the reason for using each type of question type. Please also explain the relationship between the written exam and the oral committee interview as it has been applied. Please also provide a list of candidates who have taken the test in the past six calendar years with their raw score, identifying the test they took, and the cut-off point for pass/fail for each exam administered. We also request any analysis performed evaluating any identified discrepancies in eligibility by race and gender.

   We noticed a serious problem for African-American female applicants. Of the 70 who initiated the officer candidate process, more than half dropped out before the written exam. Of those who took the exam (17), only four passed. Of those, only two chose to continue to the physical assessment test. Additionally, only one of the African-American females passed the polygraph interview. That is, based on the numbers you provided us, there were no black female candidates who were hired in 2004.

   There is also concern about the polygraph test. Based on the numbers you provided, 65 percent of white male candidates passed but only 32 percent of African-American male candidates passed the polygraph interview. To assist our understanding of this phase of the recruitment process, please provide:

- the purpose of the polygraph test as it pertains to the recruitment process, rationale behind the introduction of the polygraph test, and alternatives considered;

- list of questions asked of all candidates, and whether candidates are all asked the same questions. If not, please explain the factors used to determine which candidates are asked which questions. Please also indicate if these questions are standardized, the source of these questions, and how they are evaluated for use in the recruitment process;

- how polygraphs are administered, including whether the interviews are recorded or monitored;

- a detailed description of the record keeping system for the polygraph process;

- any remedial measures employed when a candidate fails;

Letter to Wendy L. Kelly
11/14/200                                    5

- a list of polygraph technicians, with contact information, who have administered these recruit polygraphs in the past six calendar years, including race and gender; and

- what measures are employed to ensure sensitive personal information obtained during the polygraph interview is kept confidential, any breaches of confidentiality, and remedial measures used to repair the breach.

Regarding background investigations, please explain what areas of the candidate's background are subject to scrutiny. We would also like to know what criteria are used in each area to determine whether a candidate is fit for employment, and a breakdown, by subject area, race and gender, of candidates who failed the background investigation; this includes specific reasons for failure (e.g. instead of "prior felony" or "drug use" provide specific relevant information), and how far back the background investigation reaches, by subject area.

In addition to the above information, please provide the following additional information in order for us to assess compliance with the Settlement Agreement:

- A current census of all officers, both civilian personnel and commissioned, broken down by Troop and indicating rank, gender and race, date of hire and date of promotions or demotions, if any. Included in this census should be officers who have left the State Police and the reason for leaving. We specifically request this information be provided in electronic format (ASCII if possible) as well as any printed out format.

- A list of all current white officers showing date of promotion, if any, current rank and current assignment.

- A complete list of all disciplinary actions since the time of the notice of breach (1999) by gender and race information, cause of action and the ultimate outcome of each action. Also include the names of the named plaintiffs who have been subject to discipline.

Letter to Wendy L. Kelly
11/14/200                              6

We still see recruitment as a serious problem that prevents us, at this point, from allowing the requested modification to the Settlement Agreement. As you know, it is the Class' position that the ASPD has been in perpetual breech of this agreement since September 28, 1995. In effect, you are asking that the Settlement Agreement be modified and terminated when you have not shown compliance with all of its terms.  Additionally, the above requested information provides ASPD with insight into the Class' areas of concern.  These concerns are particularly troublesome in light of the recent jury verdict in the case of Breckenridge v. ASPD.

Please provide all requested information to the above mailing address as soon as possible. Please also include an electronic copy of all documents, where available. Thank you for your continued cooperation in this matter.  Please feel free to redact the names of non-class members from any sensitive information provided.

Sincerely,

Phillip J. Duncan

cc:    Honorable Susan Webber Wright
       Barbara Thawley, Esq.
       Dr. John Veres

# DUNCAN & RAINWATER P.A.
## DUNCAN | RAINWATER | HOLT | SEXTON

FILE COPY

Phillip J. Duncan
Michael R. Rainwater
J. Stephen Holt
Robert M. Sexton

Jason E. Owens
Matthew C. Hutsell
JaNan Arnold Davis
Jeremy M. McNabb
James H. Bartolomei

November 21, 2005

*By Facsimile and U.S. Mail*

Wendy L. Kelly
Senior Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201-2610

RE:  <u>Frank E. Tappin, et. al. vs. Arkansas State Police, et. al.</u>
<u>Consolidated in USDC no. 4:91-CV-627</u>

Dear Ms. Kelly,

We are reviewing the information you provided in your November 1, 2005 letter in light of the Settlement Agreement entered on September 28, 1995. We would like to point out an observation that concerns us.

In the Order accepting the Settlement Agreement, Judge Reasoner found that the ASPD was not complying with the Consent Decree, but he believed that the new director would remedy the problem and "close the remaining gaps." The gaps he referred to included the percentage of African American troopers in positions of Sergeant and above, which was 13 percent. This was 2.36 percent below what Reasoner found the number should be. He determined that being off by this amount indicated the discriminatory practices that he believed would be remedied by the new director in 1995.

We turn now to the numbers you provided us in your November 1, 2005 letter. We are concerned with the observation that African American officers are only 11.3 percent of the officers at the rank of sergeant or above. This means that the representation of African American officers in the competitive ranks has fallen 2 percent, or 14 percent of their 1995 numbers, rather than rise as Judge Reasoner had hoped. That is, the gap has grown from 2.36 percent to over four percent. Strikingly, there is only one African American trooper at the rank of Captain. There are only three African American who are lieutenants and eight who are sergeants. This means that there is a total of only 12 officers at sergeant or above who are African American, out of 108 total commissioned officers who are ranked sergeant or above.

This suggests that either the recruitment system is not designed to hire African Americans who will be competitive at the significant ranks, or the competitive promotion system is geared to hinder their progress. It could also be that African American troopers are punished more severely than their white counterparts for the same degree of offense, which hobbles their



attempts to advance. More African American officers in the significant ranks would help overcome the historical discrimination that the ASPD has yet to remedy. Moreover, these numbers suggest that the ASPD is failing to demonstrate that their efforts since the entry of the Settlement Agreement have erased discrimination from the force. The gaps have not been closed in the 11 years since the Agreement was entered, which we believe could demonstrate a lack of good faith effort on the part of the ASPD to truly end discrimination directed against African American officers.

In light of these figures, we ask for information on promotions involving events since 1995. Please provide a time line, including any hiring or promotion freeze periods and the reason for each of those periods. We also request information on officers not selected for promotion. Please provide information on each officer who sought promotion, the specific reasons for refusing promotion, and any test scores of those officers not promoted. As an officer may seek promotion several times, please provide information on each attempt by an officer to seek promotion. Please also include race and gender.

Please feel free to redact the names of non-class members from any sensitive information. We would appreciate both electronic and hard copy of this information requested. Thank you for your continued cooperation in this matter.

Sincerely,

Phillip J. Duncan

cc:    Barbara Thawley, Esq.
       Dr. John Veres

# DUNCAN & RAINWATER P.A.
## DUNCAN | RAINWATER | HOLT | SEXTON

PHILLIP J. DUNCAN
MICHAEL R. RAINWATER
J. STEPHEN HOLT
ROBERT M. SEXTON

JASON E. OWENS
MATTHEW C. HUTSELL
JaNan ARNOLD DAVIS
JEREMY M. McNABB
JAMES H. BARTOLOMEI

November 23, 2005

*By Facsimile and U.S. Mail*

Wendy L. Kelly
Senior Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201-2610

RE:   Frank E. Tappin, et. al. vs. Arkansas State Police, et. al.
Consolidated in USDC no. 4:91-CV-627

Dear Ms. Kelly,

We are continuing to analyze the data we received from your office on November 1, 2005, while we await the information we have requested. Please consider this letter as a status report of our findings. For the purposes of this letter, we are relying on the numbers you provided us in your November 1, 2005 letter, but we are in need of the information requested in order for us to complete our analysis. We endeavor to determine whether the ASPD has complied with the terms of the Settlement Agreement. At the present time we do not believe this is the case.

The chart we provided in our earlier letter showed numbers which concerned us about how the written examination may have had a disparate impact on the hiring of qualified African-American candidates. In our analysis, we reviewed those numbers in light of the four-fifths rule. As you know, federal agencies regard selection rates of less than eighty percent as evidence of adverse impact. Please consider this a partial status report on our analysis regarding this rule.

We noted that 167 African-American candidates took the written exam, but only 57 passed, which was a pass rate of **34.1 percent**. The number is strikingly lower for African-American female candidates, of whom only **19 percent** passed. By contrast, of the 626 white candidates who took the exam, 312 passed. This is a pass rate of **63.9 percent**. Applying the four-fifths rule, we noticed that the ratio is **.534** (comparing race to race), which is significantly below the **.80** standard that federal enforcement agencies use as a guide. When we look at the African-American female candidates, the ratio is **.303** (although, when compared to white female candidates it is **.267**), which is severely below the **.80** limit. Please note the chart below which summarizes these findings.



| Written Examination | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | NS | Examined | Pass | Fail | % Pass | 4/5 Ratio |
| WM | 548 | 116 | 432 | 272 | 160 | 63.0% | 100.0% |
| WF | 78 | 22 | 56 | 40 | 16 | 71.4% | 113.4% |
| Sub-total | 626 | 138 | 488 | 312 | 176 | 63.9% | 100.0% |
| | | | | | | | |
| BM | 210 | 64 | 146 | 53 | 93 | 36.3% | 57.7% |
| BF | 70 | 49 | 21 | 4 | 17 | 19.0% | 30.3% |
| Sub-total | 280 | 113 | 167 | 57 | 110 | 34.1% | 53.4% |
| Total | 906 | 251 | 655 | 369 | 286 | 49.0% | |

We are enclosing a set of charts which summarizes our initial analysis. For example, our analysis of the physical fitness test suggests that the test may not present the same adverse impact, although it is on the cusp for white female candidates.

In our last letter, we expressed our concern about the potential adverse impact caused by the use of the polygraph. As you may note in the chart below, applying the four-fifths rule further supports our concern about adverse impact. The total ratio for African-Americans is .553, which is significantly below the .80 level federal enforcement agencies use as a guide to determine if a practice adversely impacts a class. Although, the one African-American female, who passed the polygraph, did not pass the subsequent background investigation. If we consider the polygraph and background investigation to be two phases of the same stage, then the ratio would drop even more.

| Polygraph | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | No Show | Examined | Pass | Fail | %Pass | 4/5 Ratio |
| WM | 182 | 21 | 161 | 119 | 42 | 73.9% | 100.0% |
| WF | 16 | 2 | 14 | 10 | 4 | 71.4% | 96.6% |
| Sub-total | 198 | 23 | 175 | 129 | 46 | 73.7% | 100.0% |
| BM | 31 | 6 | 25 | 10 | 15 | 40.0% | 54.1% |
| BF | 3 | 0 | 2 | 1 | 1 | 50.0% | 67.6% |
| Sub-total | 34 | 6 | 27 | 11 | 11 | 40.7% | 55.3% |
| Total | 234 | 52 | 202 | 140 | 57 | 61.9% | |

In order to further understand what these numbers mean, we need the information we requested in our November 14, 2005 letter. Rather than wait until you have compiled all the information requested, we would appreciate if you would send the information as it is available. Most importantly, we request the current contact information on all members of the Tappin Class. As we mentioned before, we received a list of class members, but not contact information. What we received was where each member was stationed. However, it is preferable for us to contact the Class members directly concerning any disparate treatment or complaints rather than direct mail to their workplace. Please send the contact information, in electronic format, as soon as possible.

We also request that a copy of all the material we requested be sent to Dr. Veres so he can review the materials and provide a status report on his findings. Thank you for your continued cooperation in this matter.

Sincerely,

Phillip J. Duncan

cc:    Honorable Susan Webber Wright
       Barbara Thawley, Esq.
       Dr. John Veres

Enclosures

| Written Examination | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | NS | Examined | Pass | Fail | % Pass | 4/5 Ratio |
| WM | 548 | 116 | 432 | 272 | 160 | 63.0% | 100.0% |
| WF | 78 | 22 | 56 | 40 | 16 | 71.4% | 113.4% |
| Sub-total | 626 | 138 | 488 | 312 | 176 | 63.9% | 100.0% |
| | | | | | | | |
| BM | 210 | 64 | 146 | 53 | 93 | 36.3% | 57.7% |
| BF | 70 | 49 | 21 | 4 | 17 | 19.0% | 30.3% |
| Sub-total | 280 | 113 | 167 | 57 | 110 | 34.1% | 53.4% |
| Total | 906 | 251 | 655 | 369 | 286 | 49.0% | |

| Physical Assessment Test | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | NS | Examined | Pass | Fail | %Pass | 4/5 Ratio |
| WM | 272 | 70 | 202 | 182 | 20 | 90.1% | 100.0% |
| WF | 40 | 18 | 22 | 16 | 6 | 72.7% | 80.7% |
| Sub-total | 312 | 88 | 224 | 198 | 25 | 88.4% | 100.0% |
| | | | | | | | |
| BM | 53 | 14 | 39 | 31 | 8 | 79.5% | 88.2% |
| BF | 4 | 2 | 2 | 2 | 0 | 100.0% | 111.0% |
| Sub-total | 57 | 16 | 41 | 33 | 8 | 80.5% | 91.1% |
| Total | 681 | 192 | 39 | 429 | 59 | 63.0% | |

| Polygraph | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | NS | Examined | Pass | Fail | %Pass | 4/5 Ratio |
| WM | 182 | 21 | 161 | 119 | 42 | 73.9% | 100.0% |
| WF | 16 | 2 | 14 | 10 | 4 | 71.4% | 96.6% |
| Sub-total | 198 | 23 | 175 | 129 | 46 | 73.7% | 100.0% |
| BM | 31 | 6 | 25 | 10 | 15 | 40.0% | 54.1% |
| BF | 3 | 0 | 2 | 1 | 1 | 50.0% | 67.6% |
| Sub-total | 34 | 6 | 27 | 11 | 11 | 40.7% | 55.3% |
| Total | 234 | 52 | 202 | 140 | 57 | 61.9% | |

| Oral Committee Interview | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total | | | Qualified | Not qualified | %Pass | 4/5 Ratio |
| WM | 89 | | | 83 | 6 | 93.3% | 100.0% |
| WF | 7 | | | 6 | 1 | 85.7% | 91.9% |
| Sub-total | 96 | | | 89 | 7 | 92.7% | 100.0% |
| BM | 6 | | | 5 | 0 | 83.3% | 89.4% |
| BF | 0 | | | 0 | 0 | 0.0% | 0.0% |
| Sub-total | 6 | | | 5 | 0 | 83.3% | 89.9% |
| total | 102 | | | 183 | 15 | 179.4% | |

# DUNCAN & RAINWATER P.A.
## DUNCAN | RAINWATER | HOLT | SEXTON

PHILLIP J. DUNCAN
MICHAEL R. RAINWATER
J. STEPHEN HOLT
ROBERT M. SEXTON

JASON E. OWENS
MATTHEW C. HUTSELL
JaNAN ARNOLD DAVIS
JEREMY M. MCNABB
JAMES H. BARTOLOMEI

December 5, 2005

*By Facsimile and U.S. Mail*

Wendy L. Kelly
Senior Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201-2610

RE:   <u>Frank E. Tappin, et. al. vs. Arkansas State Police, et. al.</u>
      <u>Consolidated in USDC no. 4:91-CV-627</u>

Dear Ms. Kelly,

Thank you for sending a draft of your proposed motion for protective order. I have reviewed the order and I am hesitant to agree to a protective order in this matter because we have not previously needed a protective order to obtain similar information. As you know, this lawsuit began in 1989, and both sides agreed to the Settlement Agreement in the interest of cooperating to end the historical discriminatory practices occurring within the ASPD. Since then, our offices have shared similar information to that we have recently requested.

You stated that the need for this order is to protect confidential information of officers. Your example included the names and addresses of officers. However, that example was based upon our request for the names and addresses of members of the Tappin Class, which includes all African-American state police officers. Since the membership of the class is variable, and since the ASPD has a current roster of officers who belong in the Class, then our request was for the ASPD to provide the Class attorneys with contact information of class members whom they currently represent.

Our purpose for obtaining a current list of African-American officers, which would include the latest hires, is to confer with all our Tappin Class clients to determine the effect of any contemporaneous disparate treatment. As you know, this creates a delay in providing our request for client contact information that we are entitled to, which creates problems with the collaborative nature we have sought to maintain throughout the Agreement. Furthermore, we did not ask for names and contact information of non-class members. Had the request included similar information on non-client officers, I might be inclined to agree with the need for confidentiality on that issue.

We also asked for a list of disciplinary actions made against class and non-class members. In an interest in safeguarding the privacy of non-class members, we suggested that you redact



personal information of non-class members, while providing us with the relevant information upon which we may compare disciplinary actions made against African-Americans in their appropriate context. Your protective order refers to an unwarranted invasion of privacy and we think that a better choice of words can be used if protection is necessary.

In the ten years since the Settlement Agreement was entered into, the ASPD has provided sporadic information that included some test scores linked to, and identifying specific officers, both of class members and non-class members. In the first round of interrogatories, the ASPD provided a complete list of African-American officers employed at that time. Throughout this time, no protective order needed to be entered to protect the confidentiality of any officer. Our request for client-identifiable information and redacted non-client information should not represent an "unwarranted invasion of privacy," especially when we encouraged the redaction of non-class members in the interests of protecting the identity of non-client officers.

Additionally, without the information we have requested, we can not address ASPD's compliance with the terms of the Settlement Agreement. The promotional system is still in flux, despite the Agreement having been in force for over a decade. The ASPD agreed in the original Agreement to have a non-discriminatory policy in place by 1996, and we agreed to extend the deadline to 1999 in the interest of providing the ASPD with sufficient time. However, as you stated in your drafted motion, the system has been changed more than once since 1999, most recently this year upon the Department of Justice's recommendation. Since our Settlement Agreement operates independently of the Consent Decree, we are concerned that we were not afforded the opportunity to have the Court Appointed Monitor review the proposed change to the promotional system that you referred to as being suggestions by the Department of Justice and which occurred this year. Since the lack of stability in the system over the past six years is a concern, to help us understand the nature of the changes, please provide information relating to any and all changes to the promotion system since we put you on notice of breach, which was January 7, 1999.

The information recently provided to us by the ASPD significantly heightens our concern that discriminatory practices may still exist. Our recent correspondence to you documents our concerns with what appears to be disparate impact against African-American candidates in the recruitment process, specifically the written exam and the polygraph. While the 4/5s rule is a general rule of thumb, nevertheless, the fact that the ratio of African-American candidates who passed was only half that of white counterparts is discouraging. While we hope that the goals of the Settlement Agreement, the prospects of meeting the goals does not look good from what we have been presented.

As there has never been a need for a protective order in the past, and since we have received similar information in the past without any showing of breaching confidentiality, I am

willing to discuss your desire for a protective order. I understand the need to mitigate any concern for the privacy issues of non-class officers, and would be more inclined to support a more narrowly tailored protective order that focuses on specific areas where a breach of privacy would more appropriately warrant a protective order, and where redaction of information would not otherwise defuse the privacy concern. When such an order is written that we both agree serves the interests of protecting privacy while sharing information, I may suggest that we jointly file the motion in keeping with the spirit of cooperation upon which our continuing Settlement Agreement was built.

At this time, I would like to reiterate the need for the ASPD to provide the requested information in a timely fashion so we can analyze compliance issues with the terms of the Settlement Agreement. Since the client-related contact information should not be an item relevant to any protective order, I would appreciate if you sent that information at the earliest possible opportunity, while we continue to discuss the potential need for a protective order in other areas. Any decision involving the Settlement Agreement that we might make necessitates we communicate with the entire client base of the Tappin Class.

Sincerely,

Phillip J. Duncan



# THE ATTORNEY GENERAL
## STATE OF ARKANSAS
### MIKE BEEBE

Matthew B. McCoy
Assistant Attorney General

Direct dial: (501) 682-1319
Facsimile: (501) 682-2591
E-mail: matthew.mccoy@arkansasag.gov

February 16, 2006

Ms. Elaine Grant
Ms. Barbara Thawley
U.S. Department of Justice
Civil Rights Division
601 "D" Street, NW
Employment Litigation Section, Room 4500
Washington, D.C. 20004

*Via Federal Express and
Facsimile*

**RE:  *United States of America v. State of Arkansas, et al.,* consolidated with *Tappin
v. Arkansas State Police,* USDC LR-C-78-25 and LR-C-91-627**

Dear Ms. Grant and Ms. Thawley:

In response to your January 19, 2006, correspondence, Arkansas State Police has prepared the following responses:

*(1) A copy of the PAT test scores, by event, for each individual who has taken the trooper PAT, and a copy of each candidate's score sheet.*

**(1) Document A**  -  PAT test scores for 2000 and 2003
**(2) Document B**  -  PAT test scores for 2004 and 2005

*(2) A description of any pre-test training or conditioning provided to candidates prior to the administration of the PAT, if any.*

**(3) Document C** -    Arkansas State Police Physical Fitness Assessment Test Practice Log (Practice is made available to those applicants wanting to practice for the test)

323 Center Street • Suite 1100 • Little Rock, Arkansas 72201
(501) 682-2007 • FAX (501) 682-2591



**(4) Document C** -   Physical Fitness Assessment Test Battery, as found on Arkansas State Police Web Page under "Recruitment"

**(5) Document C** -   Information for a trooper position – Information regarding Physical Fitness Assessment Test Battery included with packet going to all potential applicants

*(3) The basis for the passing points selected for each event of the PAT.*

**(6) Document C** -   (The Cooper Aerobics Center) physical fitness tests, standards, and programs in law enforcement

*(4) Whether troopers are required to meet any physical fitness or performance standards after their appointment, and if so, a copy of those standards and a description of how they are implemented.*

**When the PAT was implemented in 1999, ASP intended to have incumbent troopers meet these same requirements, through an incentive program initially. The application of these standards to the current workforce has not been implemented due to the frequent changes in administration over the following years. In fact, when ASP moved into its current location in Little Rock, the plans included a gym which is available to all employees. The gym was part of the plan to implement a physical fitness standard for all officers. Any officer who is unable to meet the essential job functions would be referred to a medical doctor. As of today; however, there have been no physical fitness performance standards required for troopers after their appointment.**

*(5) A current list of disqualifying factors for employment as a trooper, and a current list of those factors that are not automatically disqualifying, but that are considered in evaluating an applicant's character or suitability for employment, along with a description of how these factors are applied.*

**(7) Document C** -   Arkansas State Police Applicant Disqualifier List not available to the public is attached; the disqualifier list for applying for a commissioned officer position is available on ASP's website.

*(6)    A description of any changes in the polygraph or background screening procedures that were made since 2003, if any, and the rationale for each change.*

**There have been no changes in the polygraph or background screening procedures since 2003.**

*(7) With regard to the questions asked as part of the polygraph screening and background check, please indicate the reason for the inclusion of questions about a candidate's credit history, debts, receipt of government benefits, and other financial issues and a description of the extent to which a candidate's credit history is used as a qualifying factor.*

Although the credit history is reviewed and may be used as an indicator, it is not used to disqualify any candidate. It is necessary for ASP to be aware of an applicant's financial situation, particularly if it is something that would make the applicant an easy target for bribery. ASP does attempt to assess whether an applicant meets certain legal obligations such as child support and payment of income and/or property taxes. All applicants with credit issues are advised to take care of the problems, but they would not be rejected solely on this basis.

*(8)     In machine readable format, the test score data pertaining to each individual for each test administration during the years 2003-2005, identified by race and sex, including both raw scores and T-scores for each test component and test score overall, together with an analysis of the pass/fail rates for women and African Americans overall and by test component.*

**(8)  Document C**  -  Test scores with analysis of pass/fail rates 2003-2005

*(9)     The dates on which the written entry-level examination, the entry-level PAT, and the promotional examinations were administered from 2000 through the present. Please specify the dates of the administration of the written entry-level trooper examination for each data set that was provided with your correspondence of September 20, 2005 and September 23, 2003, including the time period over which candidates from each data set were hired.*

**(9) Document C**  -  Dates of promotional examinations
**(10) Document C**  -  Dates of written entry-level trooper examinations
**(11) Document C**  -  Dates of entry-level PAT examinations

*(10)    To the extent it was not included with you correspondence of September 20, 2005 and September 23, 2003, any updates to the recruit school hiring data for the years 2003-2005.*

**Prior to 2003 the preliminary selection of applicants was made by ASP Majors prior to their selections being presented to the Colonel for approval.**

If you have any questions, please let me know.

Sincerely,

*Matthew McCoy*
Matthew McCoy
Assistant Attorney General

cc: Mr. Philip Duncan (w/o encl.)
    Dr. John Veres

U.S. Department of Justice

Civil Rights Division

DJP:WBF:EJG:llc
DJ 170-9-21

*Employment Litigation Section - PHB*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC  20530*
*www.usdoj.gov/crt/emp/emphome.html*

January 19, 2006

By Facsimile and U.S. Mail

Wendy L. Kelley
Senior Assistant Attorney General
State of Arkansas
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201-2610

Re:    United States of America v. State of Arkansas, et al., No. 4:78-CV-25 (E.D. Ark.)

Dear Ms. Kelley:

We have reviewed the trooper applicant testing data provided with your correspondence of September 20, 2005 and September 23, 2003. That data indicates that the written examination and the polygraph screening administered to entry-level trooper applicants has an adverse impact on African-American applicants, and that the physical assessment test ("PAT") administered to entry-level trooper applicants has an adverse impact on female applicants.

The African-American pass rate on the trooper written examination is approximately half that of the white pass rate. These differences in pass rates between African-American and white test-takers are statistically significant. The data provided with your correspondence of September 20, 2005 indicates that in 2004, 682 applicants took the Arkansas State Police written trooper examination, of whom 167 (24.5 %) were African-American. Of the 381 applicants who passed the written trooper examination in 2004, 57 (or 15%) were African-American. The pass rates on the 2004 written trooper examination for white and African-American test-takers were 63.9% and 34.1%, respectively.

The data provided with your correspondence of September 23, 2003 shows a similar result. In that data set, 643 applicants took the written trooper examination, of whom 130 (20.2%) were African-American. Of the 354 applicants who passed the written trooper examination, 41 (or 11.6 %) were African-American. The pass rates for white and African-American test-takers were 60.8% and 31.5%, respectively.

**EXHIBIT**
tabbies®
22

- 2 -

Compliance information submitted by the State also indicates that the PAT administered by the State to trooper applicants has an adverse impact on women. From 2002 through 2004, the State administered its PAT to 544 men and 47 women. The pass rate for men was 89.7% while the pass rate for women was 66.0%, a difference that is statically significant. The no-show rate for female applicants, 46.6%, was also substantially higher than the no-show rate for male applicants, 36.9%.

We have previously requested that the State provide us with any evidence concerning the validity or job-relatedness of the PAT. We understand that this test was developed by the Arkansas State Police. To date, the State has not submitted a job analysis or validation study for this test. If the State has any additional documentation concerning the job-relatedness of this test, please provide it to us.

With regard to the polygraph screening, the data provided with your correspondence of September 20, 2005 shows a disparity in pass rates between white and African American trooper applicants in 2004. The pass rates on the 2004 polygraph for white and African-American test-takers were 73.7% and 40.7%, respectively, a difference that is statistically significant.

To assist in our consideration of these issues, we request that the State also provide us with the following no later than February 17, 2006:

1)   A copy of the PAT test scores, by event, for each individual who has taken the trooper PAT, and a copy of each candidate's score sheet.

2)   A description of any pre-test training or conditioning provided to candidates prior to administration of the PAT, if any.

3)   The basis for the passing points selected for each event of the PAT.

4)   Whether troopers are required to meet any physical fitness or performance standards after their appointment, and if so, a copy of those standards and a description of how they are implemented.

5)   A current list of disqualifying factors for employment as a trooper, and a current list of those factors that are not automatically disqualifying, but that are considered in evaluating an applicant's character or suitability for employment, along with a description of how these factors are applied.

6)   A description of any changes in the polygraph or background screening procedures that were made since 2003, if any, and the rationale for each change.

- 3 -

7) With regard to the questions asked as part of the polygraph screening and background check, please indicate the reason for the inclusion of questions about a candidate's credit history, debts, receipt of government benefits, and other financial issues and a description of the extent to which a candidate's credit history is used as a qualifying factor.

8) In machine readable format, the test score data pertaining to each individual for each test administration during the years 2003-2005, identified by race and sex, including both raw scores and T-scores for each test component and test score overall, together with an analysis of the pass/fail rates for women and African Americans overall and by test component.

9) The dates on which the written entry-level examination, the entry-level PAT, and the promotional examinations were administered from 2000 through the present. Please specify the dates of the administration of the written entry-level trooper examination for each data set that was provided with your correspondence of September 20, 2005 and September 23, 2003, including the time period over which candidates from each data set were hired.

10) To the extent it was not included with your correspondence of September 20, 2005 and September 23, 2003, any updates to the recruit school hiring data for the years 2003-2005.

As you know, the Court's Order of September 21, 2004 requires that the State implement, subject to our review, selection and promotional procedures that are non-discriminatory in purpose and effect. As the Order also provides that the Consent Decree shall expire in two years subsequent to its entry absent a motion for extension, we would like to ensure that any outstanding issues regarding the State's selection procedures are addressed promptly. Accordingly, we would like to arrange a meeting in Little Rock with you, representatives of the Arkansas State Police, the written test developer (AON Consulting, Inc.), and Dr. Veres to discuss potential mechanisms for reducing or eliminating the disparate impact in the trooper selection process that would serve the State's legitimate interests, including alternative uses of the written test. To the extent counsel for the *Tappin* class is interested in participating in this meeting as it pertains to issues in the *Tappin* case, we do not object to their participation.

- 4 -

Please contact either Barbara Thawley at (202) 514-3852 or Elaine Grant at (202) 305-8686 to discuss your availability for a meeting.

Sincerely,

David J. Palmer
Chief
Employment Litigation Section

By:

Elaine Grant
Senior Trial Attorney
Employment Litigation Section

cc:   Philip J. Duncan, Esq.
Dr. John G. Veres, III



Attorneys:
Phillip J. Duncan
. . s H. Bartolomei

Case Managers:
Wayne Duncan
Don Griffin

Paralegal:
Deborah Blackburn

Staff:
Barbara Bambrick
Suzanne Bartolomei
Rob Pointer

**DUNCAN**
FIRM  P.A.

June 6, 2006

Dr. John G. Veres, III, Ph.D.
Auburn University
600 Court Street
Montgomery, AL  36104

     Re:    *Tappin, et al. v. Arkansas State Police Department, et al.*
            USDC, Eastern District of Arkansas, Western Division
            No. LR-C-91-627

Dear Dr. Veres:

    In May of 1999 you were presented with a validation study by Aon Consulting and you wrote a letter at that time stating that the validation looked promising but you would have to see the results and the implementation of the system before you could render an opinion on it.  I am enclosing a copy of that validation as well as a May 26, 2006 letter from Matthew McCoy, Assistant Attorney General. Additionally I am enclosing the Sergeant's exams from 1999 through 2005; the Lieutenant's exams From 1999 through 2005; Hiring and Promotional Examination Materials, Forms and Scores; and a letter that I sent back to the Attorney General's office asking for the material to be in an electronic format for you to be able to examine.

    Additionally I am enclosing statistical graphs of the statistical analysis/hiring process from 2005 showing a violation of the 4/5th rule as well as a statistically significant difference in the blacks and whites as they process through the written exam, the polygraph and the background checks.  I believe this shows that all of the testing components had an adverse impact on the blacks.

    The State of Arkansas is asking to be released from the Consent Decree as well as the Tappin Settlement Agreement based upon the fact there is no adverse impact.  As I told you during our recent phone conversation, our preliminary analysis shows there is an adverse impact and we have asked that this material be provided so that we could provide it to you for you to comment on whether or not this hiring, selection system and promotion system as implemented has adverse impact.

    I'm enclosing the semi-annual report from the ASPD for the first ½ of 2005 and for the second ½ of 2005.  I am also enclosing a copy of the Protective Order which covers all of this material.  As the Court Appointed Monitor, consider this a request by the Class to analyze and review this material for adverse impact.

    Sincerely,

*Phillip Duncan*

Phillip Duncan

EXHIBIT
23

6315 Ranch Drive, Little Rock, AR 72223 • P.O. Box 17850, Little Rock, AR 7222
(501) 228-7600 office • Toll Free 877-6-DUNCAN • 501-868-2505 fax • DuncanFirm.com