IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA,　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　Plaintiff,　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
vs.　　　　　　　　　　　　　　　*　　No. 4:78cv00025 SWW
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
STATE OF ARKANSAS, et al.,　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　Defendants.　　　　　*

CONSOLIDATED WITH

FRANK E. TAPPIN, et al.,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　Plaintiffs,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
vs.　　　　　　　　　　　　　　　*　　No. 4:91cv00627 SWW
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
ARKANSAS STATE POLICE　　　　　　*
DEPARTMENT, et al.,　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　　　Defendants.　　　　　*

MEMORANDUM AND ORDER

For nearly thirty years, the Arkansas State Police Department ("ASPD") has been under

federal court supervision by way of a Consent Decree and subsequent Settlement Agreement

concerning past discrimination in its employment policies and practices.  The question before

this Court is whether ASPD has satisfied certain agreed upon obligations such that court

supervision may now end.  For the reasons that follow, the Court finds that ASPD has indeed

satisfied those obligations.

I. <u>Background</u>

On February 1, 1978, the United States filed a complaint against the State of Arkansas and Directors and Commissioners of the ASPD alleging that defendants had engaged in a pattern or practice of unlawful employment discrimination against African-Americans and women on the basis of race and sex in violation of federal law. *See United States v. State of Arkansas, et al.*, No. 4:78cv25 SWW. That same day, a Consent Decree was entered between the United States and the State of Arkansas, the purpose and intent of which was "to ensure that [African-Americans] and women are not disadvantaged by the hiring, promotion, assignment and other employment policies and practices of the ASPD" and that harm due to past unlawful discrimination be remedied.

On September 27, 1991, African-American commissioned employees of the ASPD filed a class action complaint against ASPD, among others, alleging that ASPD had engaged in unlawful employment discrimination against them and other African-American Arkansas State troopers in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and other federal laws. *See Tappin, et al. v. Arkansas State Police Department, et al.*, No. 4:91cv627 SWW ("Tappin"). By way of relief, plaintiffs sought, among other things, enforcement of the 1978 Consent Decree in *United States v. State of Arkansas, et al*., No. 4:78cv25 SWW. The two actions were consolidated and class action status was granted. Subsequently, on October 6, 1995, a proposed Settlement Agreement was approved by the Court in large measure.[1] Like the

___

[1] The Court dissolved a provision for numerical quotas in the Settlement Agreement.

Consent Decree, it was the "purpose and intent of [the] Settlement Agreement to ensure that African-American men and women are not disadvantaged by the selection, hiring, assignment, and promotion policies and practices of the Arkansas State Police Department."

Court supervision of the Consent Decree and Settlement Agreement continued over the ensuing years. In August 2004, the consolidated action was transferred to this Court from the docket of the late Judge Reasoner and this Court held a hearing to resolve pending motions. Following the hearing, this Court, by Order dated August 20, 2004, deferred ruling on a joint motion of the parties to modify the Consent Decree and denied ASPD's motion to terminate the Court's supervision of the Settlement Agreement without prejudice to renew. This Court found that it had continuing jurisdiction over the Settlement Agreement and encouraged the parties to work together toward resolving any outstanding issues and setting a date for its termination. Subsequently, this Court, by Order dated September 21, 2004, granted a joint motion of the parties to modify the Consent Decree and stated that the Consent Decree would remain in effect for two years from the date of the Order.

On August 4, 2006, plaintiffs filed a Motion for Extension of Tappin Settlement Agreement [doc.#188], stating they have analyzed enough information to determine that there have been violations of the Settlement Agreement concerning adverse impact to African-American troopers in the implementation and utilization of polygraph and written entrance exams. ASPD opposed plaintiffs' motion to extend and filed Defendants' Renewed Motion to Terminate the Court's Supervision of the Tappin Settlement Agreement [doc.#189], stating the terms of the Settlement Agreement have been met. Plaintiffs, in turn, filed an Amended Motion for Enforcement of Tappin Settlement Agreement [doc.#190].

Meanwhile, the Consent Decree expired on September 23, 2006, and the United States Department of Justice ("DOJ"), by letter dated September 25, 2006, requested that *United States v. State of Arkansas, et al.*, No. 4:78cv25 SWW, be closed on the Court's docket and in the electronic filing system. That request was granted and this case is now proceeding solely pursuant to the Tappin Settlement Agreement.

On November 21, 2006, this Court held a hearing on Defendants' Renewed Motion to Terminate the Court's Supervision of the Tappin Settlement Agreement and plaintiffs' Amended Motion for Enforcement of Tappin Settlement Agreement.[2] This Court allowed additional briefing and submission of exhibits following the hearing and the matter is now ripe for determination.

## II. Discussion

### A. Settlement Agreement

Other than the general prohibition against discrimination in the hiring, promotion, assignment, and implementation of employment policies and practices, ASPD's remaining obligations under the Settlement Agreement are as follows:

> Section III (D) Human Relations Courses. The Employer will establish Human Relations courses on race and gender to be presented to all new recruits in schools and presented to all other sworn personnel through in-service training.
>
> * * *
>
> Section III (F) Minority Recruitment. The recruiter to be designated (as stated hereinabove [one of the four named plaintiffs promoted to sergeant]) will be trained and provided with the support and assistance customary for a recruiter.

---

[2] The Court denied as moot plaintiffs' motion for extension of the Tappin Settlement Agreement [doc.#188].

* * *

Section I (K)  <u>Development and Implementation</u>.  [T]he Employer shall...develop and implement non-discriminatory systems for selection and hiring and for promotion.

* * *

Section III (E)  <u>Hiring/Promotion System</u>.  The Employer will develop and implement two non-discriminatory systems–one for selection and hiring of commissioned or certified law enforcement officers (troopers) and the other for promotion to sergeant and lieutenant.  Dr. John Veres will be involved in the development and implementation of the systems and will make quarterly reports to the Court and the parties on the progress of the systems...[3]

The Settlement Agreement contemplated that the Court would retain "continuing jurisdiction of this matter for two years for the sole purpose of enforcing this settlement agreement."  Section I (E).


B. <u>Plaintiffs' Contentions</u>

In their amended motion to enforce the Settlement Agreement, plaintiffs state they have been continually analyzing information to determine if the Settlement Agreement objectives have been met and "are asking that the current Settlement Agreement simply not expire at this time, as there are significant questions as to whether or not its objectives have been met."  Pl.s' Am. Mot. for Enforcement of Tappin Settlement Agreement at ¶¶ 44, 49 [doc.#190].  Plaintiffs state they have "recently identified adverse impact regarding African-American troopers and the written trooper exam," and that "[s]o long as the recruitment and hiring issues continue to persist, the terms of the Settlement Agreement cannot be considered fulfilled.  Additionally, the

---

[3] Dr. Veres was originally retained by plaintiffs but was subsequently appointed as the Court's monitor by Judge Reasoner.

promotion system is ultimately effected [sic] by deficiencies in the recruitment and hiring areas."
*Id*. at ¶¶ 12, 62. In a later filing, plaintiffs go somewhat further, "contend[ing] that ASP has been
in continual breach of the [Settlement Agreement] since 1999 based on numerous failures to
implement a non-discriminatory hiring and promotion system, failure to timely enact human
relations courses and require all members to attend, and failure to comply with the minority
recruiting portion of the [Settlement Agreement]." Pl.s' Am. Status Summary and Exhibits at 3
[doc.#194]. Plaintiffs state that "[t]he [Settlement Agreement] is **contractual** in nature and the
contractual agreement was breached as of 1999." *Id*. (emphasis in original).[4] In their latest
pleading, plaintiffs "ask that the monitoring period be extended until such time as there is
additional data to evaluate the effectiveness of the hiring and promotion systems, recruiting and
human relations course, as well as until the remaining concerns of the Class Members are
addressed." Pl.'s Resp. to Def.s' Objections to Pl.s' Am. Status Summary, Exhibits, and Tappin
Correspondence at 2 [doc.#203].

 Regardless of whether plaintiffs are merely asking that the Settlement Agreement not
expire at this time or whether they are contending that ASPD has been in continual breach of the
entire Settlement Agreement since 1999, the question for this Court is the same: whether ASPD
has satisfied the remaining four obligations of the Settlement Agreement – establishment of
human relations courses, implementation of a minority recruitment plan, implementation of a
nondiscriminatory hiring system, and implementation of a nondiscriminatory promotion system
for the ranks of sergeant and lieutenant – such that court supervision of the Settlement

---

[4] Settlement agreements, including those entered into by the government, are viewed in light of governing contract principles, *Harris v. Brownlee,* — F.3d —, 2007 WL 569995 (8th Cir. Feb. 26, 2007), and, indeed, the Settlement Agreement in this case asserts that its terms "are contractual in nature and not merely recital." Section I (D).

Agreement may now end.

## C. ASPD's Compliance

### 1. Human Relations Courses

The Court finds that ASPD has satisfied Section III (D) of the Settlement Agreement, which requires that it establish Human Relations courses on race and gender to be presented to all new recruits in schools and presented to all other sworn personnel through in-service training. Plaintiffs do not dispute that "[a]ll recruits are required to take classes on workplace diversity and human relations through [Department of Finance Administration's] Interagency Training and/or through the Criminal Justice Institute during basic training" and that presently, "almost every officer at the Arkansas State Police has received such instruction through these outside agencies." Def.s' Renewed Mot. to Terminate Court's Supervision of Tappin Settlement Agreement (Eddy Decl. at ¶ 13). In addition, "all supervisors are required to attend The Human Element (T.H.E.) Course which includes training in diversity and requires supervisors to address and resolve complaints regardless of their nature," *id.*, and ASPD has previously and continuing through 2006 taught such courses as "Gender Relations," "Race Relations & Sensitivity," "Cultural Diversity," "Sexual Harassment," and "Cultural Awareness & Workplace Diversity." Def.s' Hearing Br., Ex. 1-12.[5] Plaintiffs do not dispute the teaching of these courses, but merely complain that the workplace diversity course given to new recruits is a "general or generic course" taught in a "lecture format" that does not, in their view, "sufficiently address the hard

---

[5] During the November 2006 hearing, plaintiffs stipulated to ASPD's hearing exhibits, *see* Tr. at 61; Order dated January 12, 2007 [doc.#198], and they do not challenge in their pleadings filed after the November 2006 hearing the accuracy of ASPD's hearing exhibits.

issues involved in a discriminatory work environment." Pl.'s Resp. to Def.s' Hearing Br. at 4-6. Plaintiffs do not reference any exhibit in the record in making these assertions (other than their own counsel's letters), and the mere fact that one or more courses are taught in a lecture format does not demonstrate non-compliance.

## 2. Minority Recruitment

The Court additionally finds that ASPD has satisfied Section III (F) of the Settlement Agreement, which requires that the minority recruiter to be designated be trained and provided with the support and assistance customary for a recruiter. An outline of ASPD's recruiting history from 1979 through 2006 is set forth in Def.s' Hearing Br., Ex. 13, and will not be repeated here. Addressing more recent events, the Court notes that in 2005, Sergeant Alex Finger, an African-American male, was permanently assigned to the Recruiting Section, having previously been temporarily so assigned since September 2003, and he is the supervisor for the section. Def.s' Renewed Mot. to Terminate Court's Supervision of Tappin Settlement Agreement, Ex. D-2. Corporal Alvernon Rogers, an African-American male, was also transferred to the Recruiting Section in 2005 as a full-time recruiter. *Id.* In addition there are twelve part-time recruiters located throughout the state, of which five are African-American males, two are African-American females, two are white females, one is a white male, and one is a Hispanic male. *Id.* The recruiters received training in 2004 and 2005, which included instruction in understanding veterans, Baby Boomers, Generation X, Generation Nexters, interview techniques, applicant testing, compensation and benefits, and background investigation. *Id.* Both full-time recruiters have been issued laptop computers for use while

traveling and seven of the part-time recruiters have been issued laptop computers for their full-time positions that are loaded with appropriate recruiting forms and information for use in recruitment functions. *Id.* In addition, the ASP has developed several recruiting videos, created several posters, and designed a website to assist with its minority recruiting efforts. Def.s' Hearing Br., Exs. 20-25.

Implementation of the Recruitment Plan has yielded non-discriminatory results. The original goal for hiring of both commissioned and civilian African-American employees was 15.2% respectively. Def.s' Hearing Br., Ex. 26. The percentage of commissioned African-American employees is now 15.9%, while the percentage of African-American employees in civil positions is now 18.2%. *Id.* Indeed, the percentage of both commissioned and civil African-Americans employed by ASPD surpasses the percentage of 20 to 34 year old African-Americans even available for employment in the Arkansas workforce (15.2% based on Arkansas' latest census). *Id.* Ex. 31.[6]

Plaintiffs do not dispute these percentages and acknowledge that in 2005, ASPD developed a strategic recruiting plan aimed at minority recruiting and that "[t]he parties applauded the effort ...." Pl.s' Am. Status Summary and Exhibits at 22. Plaintiffs merely argue that "simple steps could be taken to further improve and certify the ASP's commitment to minority recruiting, such as having a minority recruiting officer with a rank of lieutenant or above." *Id.*[7] Regardless of whether the recruiting plan could be further improved, this Court,

---

[6] By way of comparison, the Consent Decree provided that "[t]he defendants have agreed that in determining whether compliance has been achieved, an appropriate standard of comparison is the proportion of [African-Americans] between the ages of 20 and 34 years in the work force ...." Consent Decree ¶ 2.

[7] Plaintiffs cite no authority and, other than Sgt. Finger's own belief as expressed in his affidavit, present no evidence supporting their assertion that a recruiting officer with a rank higher than sergeant would "further improve" minority recruiting.

like the parties, applauds ASPD's minority recruiting efforts and finds that ASPD has satisfied

Section III (F) of the Settlement Agreement.[8]

### 3. Hiring and Promotion Systems

Finally, the Court finds that ASPD has satisfied Sections I (K) and III (E) of the

Settlement Agreement, which requires that it develop and implement non-discriminatory systems

for the selection and hiring of troopers and for promotion to sergeant and lieutenant. The Court

first turns to ASPD's selection and hiring system.

### a. Selection and Hiring System

Pursuant to ASPD's Trooper Applicant Hiring Process, all candidates must be a U.S.

citizen, must be a minimum age of 21, must posses a current and valid driver's license, must be a

high school graduate or equivalent, and, among other things, must have the ability to read, write

and speak the English language. Def.s' Hearing Br., Ex. 30. They may not have any felony

conviction or misdemeanor convictions involving crimes of domestic abuse, theft or moral

turpitude. *Id.* In addition, certain levels of drug use or illegal activity relating to drug use,

alcohol abuse, and membership in a subversive organization will serve as a disqualifier. *Id.*

Assuming the above-required minimum qualifications are confirmed by the completion and

submission of the Arkansas State Police Initial Contact Form and there are no disqualifiers, the

selection process proceeds to the following steps: (1) written examination; (2) physical

---

[8] In their most recent pleading, plaintiffs do not acknowledge the 2005 ASP Recruitment Plan Report but only point to pre-2004 actions in arguing that the Settlement Agreement's minority recruitment obligations must continue to be monitored. Pl.s' Resp. to Def.s' Objection to Pl.s' Am. Status Summary, Exhibits and Tappin Correspondence at 1-2. The Court notes that it informed the parties during the November 2006 hearing that it did not "want to tread where Judge Reasoner went." Tr. at 60.

assessment test; (3) polygraph examination; (4) background investigation; (5) interview before

the ASP Applicant Interview Board; (6) interview with the ASP Director or designee; and (7)

passing recommendation from both a medical examination and a psychological examination.  *Id*.

As previously noted, the percentage of African-American recruits selected by ASPD in

the last four years (2003-2006) under ASPD's Trooper Applicant Hiring Process surpasses the

percentage of 20 to 34 year old African-Americans available for employment in the Arkansas

workforce.  Def.s' Hearing Br., Ex. 31.  Nevertheless, plaintiffs contend that ASPD has not

satisfied the Settlement Agreement's requirement that it develop and implement a non-

discriminatory system for the selection and hiring of troopers because the written examination

and Polygraph/Background components of the selection and hiring system cause a disparate

impact on African-American troopers.

In assessing plaintiffs' claim of disparate impact in the written examination and

Polygraph/Background components of the selection and hiring system, this Court looks to Title

VII principles for guidance.  In this respect, "Title VII forbids the use of employment tests that

are discriminatory in effect unless the employer meets 'the burden of showing that any given

requirement [has] ... a manifest relationship to the employment in question.'"  *Firefighter's*

*Institute for Racial Equality ex rel. Anderson v. City of St. Louis*, 220 F.3d 898, 903 (8th Cir.

2000) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)), *cert. denied*, 532

U.S. 921 (2001).  "If a plaintiff establishes a prima facie case of disparate impact from a testing

procedure, then the employer has the burden to justify the procedure by demonstrating that it is

related to safe and efficient job performance and is consistent with business necessity."  *Id.* at

904 (citing 42 U.S.C. § 2000e-2(k); *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir.), *cert.*

*denied*, 528 U.S. 1063 (1999)).  If the employer can meet this burden, the plaintiff can still

prevail if he can show that there is an alternative selection method that has substantial validity

and less disparate impact."  *Id.  See also E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 742 (8th Cir.

2006).  If such an alternative exists, the employer must choose the less discriminatory method.

*Allen*, 181 F.3d at 904 (citing *Hawkins v. Anheuser-Busch, Inc.*, 697 F.2d 810, 816 (8th Cir.

1983)).  Under the Equal Employment Opportunity Commission's Uniform Guidelines on

Employee Selection Procedures, adverse impact is inferred if members of a protected group are

selected at a rate that is less than four-fifths (80%) of the rate at which the group with the highest

rate is selected.  *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 995 n.3 (1988) (citing 29

C.F.R. § 1607.4(D)).[9]


i. Written Examination

Based on a recommendation from Dr. Veres, the ASPD contracted with Aon Consulting

in 1999 to develop and validate a job-related entrance examination.  Def.s' Hearing Br., Ex. 34.

Aon conducted a validation process of the entrance examination with incumbent troopers sitting

for the examination.  *Id.* Ex. 33.  By letter dated May 6, 1999, Dr. Veres concluded that "the

process developed by Aon and documented in its report represents a job-related procedure that

will prove useful to the Arkansas State Police (ASP) in making hiring decisions."  *Id.* Ex. 34.

---

[9] Plaintiffs state that ASPD "seems to apply a Title VII analysis to many of the disputed factors, but the law of contracts is the primary focus at this stage."  Pl.s' Resp. to Def.s' Objection to Pl.s' Am. Status Summary, Exhibits, and Tappin Correspondence at 10.  While it is true that the Settlement Agreement is viewed in light of governing contract principles, *see* n.4, *supra*, plaintiffs do not point to anything in the record (or elsewhere) suggesting that Title VII principles may not, where applicable, be considered.  The Tappin action was filed pursuant to Title VII, a fact recognized by the Settlement Agreement, and plaintiffs themselves rely on federal standards in measuring the existence of disparate impact in this action.  *See* Pl.s' Resp. to Def.s' Hearing Br. at 6 ("Federal agencies regard selection rates of less than eighty percent as evidence of adverse impact").  The Court rejects plaintiffs' suggestion that ASPD, even though it demonstrates job-relatedness for a procedure, is nevertheless required to eliminate adverse impact in order to satisfy the Settlement Agreement.

ASPD thereupon implemented the Aon examination.

The Aon examination consists of four components: (1) (Cognitive) = Following Policies and Procedures; (2) (Biographical) = Work and School Experiences; (3) (Personality) = Score for Adjustment; and (4) (Personality) = Score for Dependability. The original passing score was calculated by taking the scores on each of the four components and adding them together. In addition, the candidate's cognitive score had to be at or above one standard deviation below the trooper's mean score that was established during the validation process, while the biographical portion of the examination that includes Work and School Experiences also had to be equal to or be above one standard deviation below the trooper's mean score. These three criteria were used in determining an candidate's passing score.

At the end of 1999, Aon had completed another validation process that incorporated scores from the ASPD as well as several law enforcement agencies in other jurisdictions. This validation process resulted in the further development of the biographical part of the examination that included the Work and School Experiences section.

After the first administration of the examination, Aon reported a statistical disparity in the passing rates of white and African-American candidates. On July 21, 2000, representatives from Aon, ASPD, and DOJ met with Dr. Veres and plaintiffs' counsel to determine whether there was an alternative scoring mechanism that would reduce the disparate impact while maintaining the integrity of the examination system. Aon analyzed the scores of the ASPD candidates and, after considering several alternatives and their viability, devised a second "Decision Rule" for the ASPD entrance examination. Def.s' hearing Br., Ex. 35. This Decision Rule, termed the "multiple hurdles" selection strategy, provided that for a candidate to pass the

examination, he or she had to be at or above one standard deviation below the ASPD trooper's mean that was established during the validation process. *Id.* Ex. 38. This Decision Rule was determined to provide the least adverse alternative with respect to African-American candidates, with only a minor decrease in operational validity, and kept in place a cognitive test minimum standard that was deemed less likely to admit ultimate training failures. *Id*. Ex. 35. Neither DOJ nor plaintiffs objected to the use of this Decision Rule.

Analysis of the 2002 applicant pool revealed that the revised scoring method continued to produce a significant disparity between the scores of African-American and white candidates, leading ASPD to express its disappointment in the results. *Id*. Ex. 36. Further analysis was done, and in 2005, after assessing the data from the 2003-2005 ASPD examinations, Aon confirmed that the data showed nearly identical outcomes for candidates tested in 2003-2005 as for those tested in 2002. *Id*. Ex. 38. Aon determined that the test components contributing most strongly to impact with respect to African-American candidates were the cognitive Following Policies and Procedures, and the Adjustment personality scale. The remaining two components, determined Aon, produced nearly identical passing rates across groups. *Id*.

In correspondence dated August 11 and August 16, 2006, DOJ proposed several adjustments to the current scoring method that were calculated to address the disparities. Tappin Correspondence, Vol. 4 (tab 268, 274). All parties met at ASPD headquarters on August 28, 2006, to discuss proposals that would ensure nondiscriminatory application of the examination and agreed to implement a new scoring method calculated to reduce disparate impact against African-American candidates while maintaining effectiveness in the selection of qualified trooper candidates. As described by plaintiffs' counsel in correspondence dated October 31,

2006,

> [t]he parties agreed upon a new method of scoring the written exam that should, in theory, eliminate the adverse impact in form. The new scoring method would forgo a minimum score on the [Following Policies and Procedures] and Adjustment portions of the exam and require a minimum overall score of 40. This is in contrast to the previous scoring mechanism of the exam, which required a minimum score of 40 on each section of the exam in order to pass and disproportionately excluded African-Americans, who scored lower on the [Following Policies and Procedures] and Adjustment components than white candidates and were subsequently disqualified based on a low score in one component of the exam, despite adequate performance on the remainder of the test.

Tappin Class Hearing Exhibits, Ex. 39. It was agreed that this newly adopted scoring mechanism would be implemented at the next administration of the examination in 2007.

As previously noted, the Court-appointed monitor determined, and plaintiffs do not dispute, that the ASPD written examination represented a job-related procedure and the record reflects that ASPD has been striving to reduce the adverse impact that continued to persist by revising the scoring mechanism for the examination on two occasions. Plaintiffs have not produced any alternative selection and hiring system that was rejected by ASPD and might have less adverse impact on African-Americans and, indeed, have approved the new method of scoring the written examination to be implemented in 2007 that they agree should eliminate or reduce the adverse impact. Accordingly, the written examination component of the selection and hiring system satisfies Sections I (K) and III (E) of the Settlement Agreement as it relates to the requirement that ASPD develop and implement a non-discriminatory system for the selection and hiring of troopers.

ii. Polygraph/Background

The polygraph examination, which is part of the overall background investigation, is administered after a conditional offer of employment is made by ASPD and is used to verify information provided by the candidate in response to a pre-employment polygraph questionnaire. Def.s' hearing Br., Ex. 42 (under seal). All candidates are asked the same questions, although some of the comparison questions may be altered in order to elicit a "no" answer, and the questions are selected from comparative questions and relevant questions available from the American Association of Police Polygraphists and the American Polygraph Association. The questionnaire contains required responses to the following items that are targeted during the polygraph phase of the examination: personal data, employment information, driving history, financial history, use of alcohol, marijuana and drugs, criminal activity, military service, theft of money, theft of merchandise (other than cash), subversive or revolutionary activity, conduct as a law enforcement officer, and conduct as a corrections officer. *Id.* Ex. 41 (under seal). Candidates are required to sign a Consent and Release form as part of the questionnaire. *Id.*

Polygraphs are administered by an examiner in a private room, one-on-one, and are not recorded other than the documentation of admissions that are signed by the candidate. An attempt is made to have the same gender and same ethnic examiners perform the examination on the candidates. The polygraph examinations are performed by Criminal Investigation Division investigators in conjunction with the background investigation.[10] The background investigation phase of the selection and hiring system requires that the ASPD investigator document and report applicant related information based on basic identification information (including

---

[10] Officers who previously performed polygraph examinations include Alex Finger, B/M; John Howell, W/M; Robert Hicks, W/M; and Wes Adams, W/M. Currently, the examinations are performed by Brett Pritchard, W/M; Ocie Ratecliff, W/M; Pardo Roberts, W/M; Paulette Ward, B/F; Steve King, B/M; Karen Clark, W/F; Bill Glover, W/M; Charlie Beall, W/M; and Stuart Woodward, W/M.

addresses and biographical data), personal history (including address information, education, family history, marital status, employment history, financial/credit history, military service, criminal history, motor vehicle driving record and drug usage), interviews with the candidate, current and/or previous employers and coworkers, schoolteachers, character references, landlords, neighbors, family members and/or close associates, and the investigator's objective summary of all facts developed during the investigation. In this respect, the candidate completes an Arkansas State Police Personal History Statement that requests information related to the above subjects. *Id*. Ex. 40. In addition, there is a list of disqualifiers (including temporary ones) used at this stage of the process that relate to such matters as a certain level of drug use, convictions for certain crimes, and pending court proceedings. *Id*. Ex. 42 (under seal). These disqualifiers, including those concerning drug standards, were formulated based on generally accepted qualifications adopted by federal and state law enforcement agencies in other jurisdictions. *Id*. Ex. 43.

Concerning disparate impact produced by the Polygraph/Background components of the selection and hiring system in recent years, examination of the 2003-2006 Recruit School data, set forth in Ex. 32, Def.s' Hearing Br., reveals the following:

1. <u>2003 Recruit School</u>

115 white candidates and 20 African-American candidates took the polygraph examination in 2003, with 70 (or 61%) of the white candidates and 12 (or 60%) of the African-American candidates passing the examination. The polygraph component thus produced an adverse impact ratio of 98%. All 70 of the white candidates and 11 of 12 of the African-American candidates proceeded to the background component. Of that number, 46 (or 66%) of

the white candidates and 6 (or 55%) of the African-American candidates passed the background component.  The background component thus produced an adverse impact ratio of 83%.

2. <u>2004 Recruit School</u>

176 white candidates and 27 African-American candidates took the polygraph examination in 2004, with 129 (or 73%) of the white candidates and 10 (or 37%) of the African-American candidates passing the examination.  The polygraph component thus produced an adverse impact ratio of 51%.  117 of the white candidates and all 10 of the African-American candidates proceeded to the background component.  Of that number, 94 (or 80%) of the white candidates and 6 (or 60%) of the African-American candidates passed the background component.  The background component thus produced an adverse impact ratio of 75%.

3. <u>2005 Recruit School</u>

241 white candidates and 40 African-American candidates took the polygraph examination in 2005, with 194 (or 80%) of the white candidates and 28 (or 70%) of the African-American candidates passing the examination.  The polygraph component thus produced an adverse impact ratio of 87%.  Only 58 of the white candidates and 13 of the African-American candidates proceeded to the background component.  Of that number, 47 (or 81%) of the white candidates and 11 (or 85%) of the African-American candidates passed the background component.  The background component thus produced an adverse impact ratio of 105%.

4. <u>2006 Recruit School</u>

223 white candidates and 33 African-American candidates took the polygraph examination in 2006, with 199 (or 89%) of the white candidates and 29 (or 88%) of the African-American candidates passing the examination.  The polygraph component thus produced an

18

adverse impact ratio of 99%. 139 of the white candidates and 23 of the African-American candidates proceeded to the background component. Of that number, 103 (or 74%) of the white candidates and 11 (or 48%) of the African-American candidates passed the background component. The background component thus produced an adverse impact ratio of 65%.

Based on the Four-Fifths Rule, there was no adverse impact in either the polygraph or background components in 2003, there was adverse impact of 51% in the polygraph component and adverse impact of 75% in the background component in 2004, there was no adverse impact in either the polygraph or background components in 2005, and there was no adverse impact in the polygraph component in 2006, but there was adverse impact in the background component that year of 65%. However, at least some of these data samples, based as they are on individual recruiting class years, arguably are too small to determine conclusively whether the Polygraph/Background components of the selection and hiring system as utilized by ASPD adversely impact African-American candidates. For example, the addition of one passing African-American candidate in the background component of the 2004 Recruiting class changes the adverse impact ratio from 75% to 87%, well within the Four-Fifths Rule. *See Mems v. City of St. Paul, Dept. of Fire and Safety Services*, 224 F.3d 735, 740 (8th Cir. 2000) (even where the Four-Fifths Rule is violated, differences in the selection rates may not constitute an adverse impact where the sample size is too small to be statistically significant).

When the polygraph and background components for the four years are considered collectively, a more comprehensive picture emerges. The polygraph data for the years 2003-2006 reveal that 755 white candidates and 120 African-American candidates took the polygraph examination, with 592 (or 78%) of the white candidates and 79 (or 66%) of the African-

American candidates passing the examination. The polygraph component thus produced an adverse impact ratio of 85%. 384 of the white candidates and 57 of the African-American candidates proceeded to the background component in the years 2003-2006. Of that number, 290 (or 76%) of the white candidates and 34 (or 60%) of the African-American candidates passed the background component, producing an adverse impact ratio of 79%. Thus, when the data over the past four years is considered collectively, neither the polygraph component nor the background component produces a statistically significant adverse impact against African-American candidates.[11]

Even were there a significant statistical disparity, it is undisputed that the Polygraph/Background components of the selection and hiring system are job-related and necessary to achieve legitimate law enforcement policy objectives of the ASPD, *see* Pl.s' Resp. to Def.s' Hearing Br. at 7-8 ("Plaintiffs recognize that the polygraph may be of such critical importance that disparate impact may be justifiable"), and plaintiffs have not produced any alternative system that was rejected by ASPD and might have less adverse impact on African-Americans. Accordingly, the Polygraph/Background components of the selection and hiring system satisfy Sections I (K) and III (E) of the Settlement Agreement as they relate to the requirement that ASPD develop and implement a non-discriminatory system for the selection and hiring of troopers.

b. <u>Promotion System</u>

---

[11] Although the 79% adverse impact ratio for the background component is 1% shy of the 80% required under the Four-Fifths Rule, the Supreme Court has observed that this Guideline provides nothing more than a rule of thumb for the courts, *see Watson,* 487 U.S. at 995 n.3, and this Court finds in these circumstances that such a minor deviation does not render the background component as not in compliance with the Settlement Agreement.

The Court now turns to ASPD's promotion system. Based on a recommendation from Dr. Veres, the ASPD contracted with SHL-Landy Jacobs ("Jacobs") to develop and validate a job-related promotion system. Def.s' Hearing Br., Ex. 44. By letter dated May 6, 1999, Dr. Veres concluded that "the promotion processes are job-related and should serve ASP well ... [and] are sufficiently well designed to meet extant standards for demonstrating job-relatedness ...." *Id*.

Under the current ASPD promotion system, set forth in Ex. 49, Def.s' Hearing Br., all vacancies for sergeant and lieutenant are advertised. In order to be considered for promotion to one of these positions, the trooper must take an examination for that rank. The sergeant and lieutenant examinations consist of both a written examination and an oral board, and the candidates are ranked by Jacobs according to performance from highest to lowest score. To be considered eligible to test for the rank of sergeant, a trooper must have three years of ASPD commissioned officer service or one year of ASPD commissioned officer service and two years of experience at a comparable law enforcement agency. A sergeant must have two years of actual in-rank service before becoming eligible to test for the rank of lieutenant.

The sergeant and lieutenant examinations are administered every two years in March, and the scores from these examinations are only utilized during a two year period from May of the examination year to May of the second year after the examination.[12] After the application period for a sergeant or lieutenant vacancy has closed, ASPD identifies the five applicants with the highest examination scores as determined by the final rankings.[13] A written summary of the top

---

[12] For example, the next examination will have occurred in March 2007, and any promotions made between May 2005 and May 2007 must be based on the 2005 rankings.

[13] If any of the top five candidates are deemed ineligible, the next highest scoring applicant is added to the list.

five applicants' personnel records are provided to the ASPD Director for final consideration. The Director then recommends the applicant he believes, in his discretion and opinion, is the most qualified for promotional consideration by the ASPD Commission.

Originally, there was no formal method for selecting from among the top five candidates for either sergeant or lieutenant positions. On August 10, 2000, DOJ advised ASPD that the absence of a uniform standard and the decision of former ASPD Director Thomas Mars to only nominate candidates for promotion to sergeant if they had a minimum of five years experience as a trooper (rather than the three years of service established under the Consent Decree) created an adverse impact on African-American candidates. Tappin Correspondence, Vol. 1 (tab 47). In September 2000, ASPD agreed to reinstate the three-year time-in-grade requirement for promotion to sergeant and, in March 2001, promoted four sergeant candidates, three of which were affected by the time-in-grade requirement. Dr. Veres subsequently conducted an analysis of the ASPD sergeant selection process for 1999/2000, and concluded the statistical disparity would be remedied by these promotions. Def.s' Hearing Br., Ex. 47.

ASPD additionally revised its promotion system in 2002 to address the absence of a uniform standard for selecting from among the top five candidates for either sergeant or lieutenant positions. *Id*. Ex. 48. The promotion system as so revised limited the Director's discretion to consideration of certain enumerated factors set forth therein and provided that his recommendations must contain documentation of all facts he considered in making his recommendation. *Id*. DOJ made suggestions for further revision of the system and a revised promotion system incorporating changes suggested by DOJ was provided plaintiffs on January 12, 2005. Tappin Correspondence, Vol. 3 (tab 229, 230). The final revised system was

implemented on May 12, 2005. Among other things, a Directors' Responsibility Section was added requiring that the Director make a written record of all promotional nominations for the positions of sergeant thru major, not just if he does not nominate the top rated candidate as previously provided, and there was additionally added a provision requiring the ASP Commission to document its reason for disapproving the Director's nomination for promotion should such a situation occur. Def.s' Hearing Br., Ex. 49. There was no objection from plaintiffs to the final revised promotion system.

ASPD's promotion system has yielded non-discriminatory results. In 2003, the percentage of African-Americans in the sergeant position was 10.2% but has risen to 15.4% in 2006. Def.s' Hearing Br., Ex. 51. In 2003, the percentage of African-Americans in lieutenant positions was 11.1% but has risen to 15.4% in 2006. *Id.* Under Col. Dozier, 15.9% of all promotions were awarded to African-Americans, and African-Americans now make up 15.9% of all individuals in sworn positions with the rank of sergeant and above. *Id.* Exs. 50, 51. As previously noted, this surpasses the percentage of 20 to 34 year old African-Americans available for employment in the Arkansas workforce. *Id.* Ex. 31.

Plaintiffs, however, state that "[t]he promotional system, revised again in 2005, is still subject to manipulation by the ASP or its agents, as outlined in Plaintiffs['] affidavits" from African-American troopers and a former ASP Commissioner. Pl.s' Resp. to Def.s' Objections to Pl.s Am. Status Summary, Exhibits, and Tappin Correspondence at 2. Plaintiffs state the ASPD Director can choose from among the top 5, basing that decision on inconsistent application of a variety of factors, and that a "candidate could easily be excluded under the current promotional system with the justification that another candidate was 'more qualified,' based on whichever

factors the ASP decides to give more weight to *in that particular selection process*."  *Id*. at 8-9 (emphasis in original).

Plaintiffs' affidavits submitted in support of their manipulation argument are based on nothing more than conjecture and beliefs that promotion decisions, which in most cases predate the current promotion system now in place, were based on discriminatory criteria.  The troopers repeatedly state in their affidavits that they "believe," "felt," and "heard" that African-American candidates were more qualified for certain positions that went to white candidates, Pl.s' Am. Status Summary and Exhibits (Exs. B-H), while the former Commissioner, who likewise apparently is referencing previous promotion policies, states in her affidavit that she "had a strong sense" that unauthorized meetings among other Commissioners were taking place and that she "believ[es]" there were occasions where discussions concerning the promotional process were taking place without her input.  *Id*. (Ex. B).  These affidavits, then, would not even be sufficient to defeat summary judgment.  *See, e.g., Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 730 (8th Cir. 2003) (case founded on speculation or suspicion is insufficient to survive summary judgment motion); *Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (conclusory affidavits, standing alone, cannot create genuine issue of material fact precluding summary judgment); *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (when an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment).

Plaintiffs seemingly recognize the infirmities with their affidavits, stating they are not "trial affidavits," but are brief descriptions of the class members' experiences of discrimination

and manipulation that led to the subjectivity of the promotion system being used against them. Pl.s' Resp. to Def.s' Objections to Pl.s' Am. Status Summary, Exhibits, and Tappin Correspondence at 2-3. Plaintiffs state "[t]he individual affidavits illustrate to the Court that there is pattern and practice of disparate treatment showing the need for further testimony." *Id.* at 3. Plaintiffs' claim of pattern and practice of disparate treatment is belied by the non-discriminatory results yielded by the promotion system (the final version of which incorporated suggestions made by DOJ and was implemented without objection by plaintiffs), and the individual affidavits do not in any case illustrate such pattern and practice but, again, simply reflect nothing more than beliefs and feelings (some based on hearsay) that promotion decisions were based on discriminatory criteria. As such, the affidavits do not demonstrate the need for additional hearings or continued court monitoring.

Even were there a significant statistical disparity with ASPD's promotion system, it is undisputed that the promotion system is job-related, Def.s' Hearing Br., Ex. 44, and plaintiffs have not produced any alternative process that was rejected by ASPD and might have less adverse impact on African-Americans. Accordingly, the Court finds that the promotion system satisfies Sections I (K) and III (E) of the Settlement Agreement as it relates to the requirement that ASPD develop and implement a non-discriminatory system for promotion to sergeant and lieutenant.[14]

---

[14] To the extent plaintiffs are attempting to pursue individual claims, the Court notes that Tappin was filed as a class action and that it concerns the implementation of hiring and promotion systems and claims that are common to all members of the class. It is does not include individual claims of alleged discrimination, a fact recognized by plaintiffs' former co-counsel in a May 18, 2001 letter to class plaintiffs: " We are pursing a *class* claim. In other words, we represent African-Americans *as a class*. We look at total numbers. All African-American ASP officers are in the class. This class litigation does not, however, include individual claims of discrimination. Any individual claim of discrimination exists separate and apart from this class litigation." Tappin Correspondence, Vol. 2 (tab 91) (emphasis in original). Although the letter went on to note that the facts of individual claims of discrimination are evidence relevant to the class litigation and requested information about any patterns or practices of race discrimination (for which separate legal help would be obtained), the affidavits upon which plaintiffs now rely,

## III. Conclusion

In September 2006, the United States, after requesting and analyzing information on several compliance issues, allowed the Consent Decree in *United States v. State of Arkansas, et al.*, No. 4:78cv25 SWW, to expire. Paragraph 2 of the Consent Decree provides: "Compliance with the provisions of this Decree, insofar as the United States is concerned, constitutes compliance by the defendants with equal employment and affirmative action requirements under all applicable Federal laws, orders and regulations with respect to the Arkansas State Police Department." The ASPD has satisfied those provisions of the Consent Decree that were incorporated into the Settlement Agreement and, whatever problems existed under prior policies and previous Directors, has now satisfied its remaining obligations under the Settlement Agreement.

Plaintiffs state they are pleased Colonel Dozier has been retained to head the ASPD in 2007 and are also pleased that Major Wayne Eddy has been joined as a consultant. Pl.s' Am. Status Summary and Exhibits at 23. Plaintiffs note that in the past, these two individuals have shown a willingness to listen and consider input on race relations from the minority troopers and that they appear to have a real commitment to rectifying any deficiencies that remain in the various systems so that future administrations and the whole of the ASPD will have the benefit of a truly race-neutral system. *Id.* at 23-24. This Court likewise has no concerns with Colonel Dozier's commitment to the goals embodied in the Settlement Agreement and is confident ASPD will continue to seek diversity among its ranks and the application of non-discriminatory

as previously noted, are hardly sufficient to demonstrate pattern and practice. That said, applicable federal and state anti-discrimination laws remain available to any member of the Tappin class who feels they have been discriminated against in the selection and hiring and/or promotion systems that are today found to be in compliance with the Settlement Agreement. In this respect, a substantive deviation by ASPD from those selection and hiring and/or promotion systems that constitutes a significant retreat from the gains recently made could be evidence of discrimination in any individual action.

employment practices.

IT IS THEREFORE ORDERED that Defendants' Renewed Motion to Terminate the Court's Supervision of the Tappin Settlement Agreement [doc.#189] be and it hereby is granted, and that Plaintiffs' Amended Motion for Enforcement of Tappin Settlement Agreement [doc.#190] be and it hereby is denied as moot.

Dated this 28th day of March 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE